W., B. & A. R. R. CO., ETC.,

*vs.*

WILLIAM H. MOSS.

*Contracts: too vague to be enforced. Employment: contract for indefinite time; at will merely.*

In order to constitute a verbal or written agreement, the parties must express themselves in such terms that it can be ascertained, to a reasonable degree of certainty, what they mean.

p. 20

If the agreement is so vague and indefinite that it is not possible to collect from it the full intention of the parties, it is void.

p. 20

Neither court nor jury can make an agreement for the parties.          p. 20

No action will lie for the breach of a contract of employment unless there is a definite fixed time for the continuance of the contract; otherwise the hiring would be merely at will, to be terminable at pleasure.          p. 21

*Decided December 4th, 1915.*

Appeal from the Circuit Court for Howard County (FOR-SYTHE, J.), to which Court the cause had been removed from the Circuit Court for Anne Arundel County.

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Burke,. Thomas, Pattison, Urner, Stockbridge and Constable, JJ.

*George Weems Williams* and *Edward M. Hammond* (with whom was *L. Vernon Miller* on the brief), for the appellants.

*Nicholas H. Green,* for the appellee.

Constable, J., delivered the opinion of the Court.

In this case the appellee brought suit against three public service corporations, the Washington, Baltimore and Annapolis Electric Railroad Company, the Annapolis Public Utilities Company and the Annapolis Gas and Electric Light Company, for breach of an alleged verbal contract and declared on said contract. Before the conclusion of the trial the declaration was amended by striking out the Annapolis. Gas and Electric Light Company as a defendant, and a verdict was found by the trial jury in favor of the appellee and against the two defendants, and from the judgment accordingly entered this appeal was taken.

The declaration, which contains but one count, avers that the appellee on the 1st day of February, 1913, was and had been, for a number of years prior thereto, engaged in a general retail grocery business in Annapolis, with a store located at 112 College avenue, which yielded an income sufficient for the support of himself and family, and in addition was an agent of the Washington, Baltimore and Annapolis Electric Railroad Company yielding a salary and other privileges; and occupied as a dwelling the property adjoining his said store, in which he conducted a successful boarding house yielding a good return; that while he was engaged in business as aforesaid, the defendant, the Washington, Baltimore and Annapolis Electric Railroad Company and the

Annapolis Public Utilities Company purchased the Annapolis Gas and Electric Light Company and desiring a more central location for a sub-station for the defendant, the W., B. & A. R. R. Co., selected the site of the plaintiff's place of business, and his dwelling as a desirable position; "and thereupon the defendants agreed and contracted with the plaintiff that upon his securing an option for the purchase of the property, so as aforesaid occupied by him, or a lease of the same, a surrender of his tenancy thereof and the closing out of his business conducted therein and thereon, to give him employment with the defendants, and in the remodeling and reconstruction of the property to provide a store for the said plaintiff, and allow him the privilege of conducting therein a lunch room and a store for the sale of such articles as are usually sold in places of like character, including tobacco, cigars, candy and ice cream; and the occupancy of the adjoining dwelling"; that acting upon the good faith of said agreement and contract the plaintiff carried out in every particular his part of the contract, but that the defendants, disregarding the said agreement failed and refused and still fail and refuse to give the plaintiff employment, and refuse to provide a store and lunch room for him and to allow him the privilege of sale on the premises as aforesaid.

The proof offered in support of the issues joined upon the filing of the general issue pleas was substantially as follows: The plaintiff conducted a store at the corner of College avenue and Bladen street in Annapolis, and resided in the house adjoining the store; that he sold tickets for the defendant, the W., B. & A. R. R. Co., for a monthly salary of five dollars and the privilege of a pass on the defendant company's road, and, in addition to these occupations, conducted a boarding house in his dwelling. The corner on which his business was located, was directly across the street from property which was owned by the Annapolis Short Line Railroad and the houses and buildings on which were about to be torn down so as to make a small park leading from College avenue to the station of the Annapolis Short Line R. R.

The Short Line is the rival transportation line of the appellant, the W., B. & A. R. R.   The property occupied by the appellee was owned by his wife's aunt and had been occupied by him since 1899.   It happened that Mr. Robert Moss, the counsel of the appellants, was also the brother of the appellee.   The appellee went to his brother and sought to have him interest the officials of the W., B. & A. R. R. Co. in the advantages to be gained by it in securing the property occupied by him and converting it into a regular station and waiting room.

Mr. Robert Moss testified that, bearing in mind the request of his brother, he took up the proposition with Mr. Bishop, the president of the appellant companies, and other officials, upon their next visit to Annapolis.   "I told him, Mr. Bishop, about the property; and told him that my brother had the property, but that he would give it up under certain conditions, and I suggested that we go down and look at the property."   He and Mr. Bishop went down and stood across the street from the property.   Mr. Bishop wished to know what the property rented for and asked witness to find out.   The witness went across and found out from his brother and continued: "I came back and told him; told him my brother would want to occupy the house, would want a place to sell sandwiches and have a little store such as was usual in places of this kind, that he also wanted a place of some kind with them, taking care of the building and selling tickets.   Mr. Bishop said it seemed all right to him, but it did not appear to me that he had made up his mind to it as yet."   Later in the same day the officials went to Mr. Moss' office and "I talked over with them the purchase of the property and told them that my brother (appellee) was the best one to see about this for them.   They told me to send for my brother; and I went for my brother and got him there."

The appellee testified that he went to the office of Robert Moss and met the officials and was sent to Baltimore to try to purchase the property; that his aunt would not sell

the property, but on his second visit, she said she would consider a long term lease; that after several visits a lease for ten years, with the privilege of renewal for ten years, was entered into between his aunt and Robert Moss, and subsequently assigned by Robert Moss to the railroad company; that the entire negotiations for the lease were carried through by the appellee, and for which he has not received any compensation. After the execution of the lease Bishop, the president; Craig, the treasurer, and Doyle, the general manager. of the appellant companies, went over and through the properties, and Bishop at that time asked him, "Mr. Moss, do you want a lunch room in here? Do you think it will pay in here satisfactorily?" That witness then produced a sketch or plan for the reconstruction, that he had made, and on the departure of the officials they took the drawing, and it proved the original idea from which the building was built. That on April 21st, 1913, the master mechanic of the railroad company came to his store and told him they were ready to proceed with the work; thereupon the appellee moved, what little merchandise he had left, into the dwelling house and turned the store building over to them; and on the same day they commenced to tear down the building and erected upon the store lot the present two-story building, now used as a station. He further testified that in the reconstruction they were not making any place for him, and he wrote the following letter to Doyle, to which he received no reply:

"Annapolis, Md., May 21st, 1913.
"Dear Sir:—

"I now make formal demand on you to carry out the contract entered into between the President and General Manager of the W. B. and A. Electric Railroad and the Annapolis Gas and Electric Light Company, parties of the first part, and myself, William H. Moss, party of the second part, to wit: That in consideration of the party of the second part securing a lease on the property corner College Avenue and Bla-

den Street and closing out his general merchandise
business and giving them possession of the property,
that the parties of the first part would give the party
of the second part privileges of said place, when com-
pleted, to sell such articles of merchandise as are usu-
ally sold in stations, and employment with said par-
ties of the first part at a fair salary. Said contract
to date from April 1st, 1913."

Witness further testified that after he knew no place had
been provided for a lunch room for him Doyle offered him a
position as meter reader at a salary of fifty dollars a month,
but that witness had refused it, for he thought if he was not
to have a lunch room he should have a position paying one
hundred dollars a month. That he moved out of the dwell-
ing house July 1st, 1913.

Mr. Robert Moss testified further that sometime after the
execution of the lease he met Mr. Bishop in Annapolis, and I
told him they were not satisfying my brother. "I said, I told
him, as I understood it, my brother was to occupy the house,
that he wanted an eating room there or a store room, a small
one there, and he wants to work with you. My idea about
that is that he could be of service to you, and so earn the
money that you would get for rent for these two places. If
you can give him something like that or equal to that, he
can make a living and be of service to you, and that he was
a sober and well-behaved fellow. Mr. Bishop said: 'All right,
I want to satisfy you.' These were the last words Mr. Bishop
said to me." After the appellee had called his attention to
the fact that in the reconstruction no place was being pro-
vided, the witness wrote under date of May 28th, 1913, to
Mr. Bishop:

"Dear Sir:—

"I came to Baltimore today to see you, but have been
unable to do so and have to return to Annapolis for a
meeting at half-past four. I had a talk with my
brother and he would like to rent the house at $25.00

per month, have a door cut from the new building into
one of the rooms of the dwelling so that he could use
that room for the purpose of furnishing lunches, cigars,
etc., in this room of the dwelling he now occupies.

"He would also take charge of the building and sell
tickets from such time in the afternoon as the other
men left, until twelve o'clock at night, and then in the
morning from the early car until the day men arrive.
During the day he would solicit business for the com-
pany, and, of course, would understand that if he did
not make a success of it, you could not pay him as
much as if he did make a success of it. He thinks he
ought to have $65.00 per month, $25.00 of which he
would pay back to the company for rent each month.
*   *   *

"I was urgent to see you today because if the door
is to be cut, Mr. Doyle ought to be told about it so it
could be done before the building is completed. My
brother would designate the place where the door is to
be cut."

No reply was made to this letter.

We have so fully set forth the evidence produced on behalf
of the appellee relating to the alleged contract, for the reason
that the appellants by their fifth prayer asked the Court to
instruct the jury that inasmuch as the alleged contract men-
tioned in the evidence was too indefinite and vague to en-
title the plaintiff to recover against the defendants, or either
of them, that therefore their verdict should be for the appel-
lants. Of course, we have not set forth nor considered any
of the testimony of the appellants unfavorable to the position
of the appellee for it is is not necessary to even cite author-
ities to sustain the proposition that in considerating a prayer
to withdraw a case from the consideration of the jury, "the
Court must assume the truth of all the evidence produced
before the jury, tending to sustain the claim, or defense as
the case may be, and all inferences of fact fairly deducible

from it as on demurrer to the evidence; and this though such evidence be contradicted, in every particular by the opposing evidence in the cause." *Jones* v. *Jones,* 45 Md. 154.

So we have seen from the testimony the negotiations were principally carried on by Robert Moss with the officials of the appellants and there cannot be said to be any lack of definiteness, either from his or the testimony of the appellee, as what the appellee was to do in the performance of his part, although there may be a difference, at times, as to which one of the appellants or how many the alleged contract was being made with. We will assume, however, for the present point, that the agreement was entered into with both the appellants. However when we come to consider what the appellants were to do we find the same witnesses at one time claiming more and at another time claiming less was to be done by the appellants. For instance, the appellee in his letter to Doyle, makes no claim for the right to occupy the dwelling while in other parts of his testimony this claim is made. But considering in the most favorable aspect to the appellee, the appellants were (1) to allow the appellee to occupy the dwelling, (2) in the remodeling of the property, to provide a store for him and allow him the privilege of conducting a lunch room and store therein, and (3) to give him employment.

Nowhere was a word of testimony produced showing when the tenancy was to begin, when end, or how long was it to continue, nor what rent was to be paid. As far as the rent is concerned, the witnesses admitted the occupancy was not to be free, but they expected the amount to be taken into consideration in fixing the salary for employment, or in other words to be deducted from the amount otherwise would be allowed as salary. The letter of Robert Moss of May 28th shows this was the proposition made by him at that time, and so far as the record discloses this was the first and only time the amount of rent was mentioned; and this letter was never answered. What has been said as to the dwelling ap-

plies with even more force to the occupancy of the store. In the promise to employ, the character of the employment was not fixed or determined, nor the amount of salary, nor the duration of the term of employment.

"The law is too well settled" said JUDGE MILLER, in *Thomson* v. *Gortner,* 73 Md. 475, "to admit of doubt, that in order to constitute a valid verbal or written agreement, the parties must express themselves in such terms that it can be ascertained, to a reasonable degree of certainty, what they mean. And if an agreement be so vague and indefinite that it is not possible to collect from it the full intention of the parties, it is void; for neither the Court nor the jury can make an agreement for the parties. Such a contract can neither be enforced in equity nor sued upon in law."

In the case of *Delashmut* v. *Thomas,* 45 Md. 140, which was a suit on the breach of a covenant which was in these words; "the said Delashmut to have the preference of renting said property as long thereafter as it shall be rented for a store," the Court said: "Here there is no covenant to renew the former lease, nor any stipulation whatever either as to the time, for which the lessee might have preference or privilege to rent; nor with regard to the rent to be paid. 'A covenant to let the premises to the lessor at the expiration of the term without mentioning any price for which they are to be let * * * is altogether void for uncertainty.' *Taylor Land. & Tenant,* sec. 333. Construing the contract in the most favorable way for the lessee, it left to the lessor the absolute right to fix the rate of rent, and the terms upon which he would let the property to the lessee after the expiration of the term. Such a contract was altogether vague and uncertain, and conferred no definite rights upon the lessee which he could enforce either in law or equity." See also *Blackistone* v. *German Bank,* 87 Md. 302; *Gelston* v. *Sigmund,* 27 Md. 334; *Myers* v. *Forbes,* 24 Md. 598; *Howard* v. *Carpenter,* 11 Md. 278 and *Dorsey* v. *Wayman,* 6 Gill, 59.

It is equally well settled that no action will lie on the breach of a contract of employment unless there is a definite time fixed for the continuance of the employment. The reason for the rule is that the hiring would be one merely at will and could be terminated at the pleasure of either party. *McCullough Iron Co.* v. *Carpenter,* 67 Md. 554; *Wood on Master & Servant* (2nd Ed.), sec. 133 and 81; *Blaisdell* v. *Lewis,* 32 Me. 515; *S. F. & W. R. Co.* v. *Willett,* 43 Fla. 311; *Louisville & Nashville R. R.* v. *Offutt,* 99 Ky. 427; *Shaw* v. *Woodbury Glass Works,* 52 N. J. L. 7; *Harrington* v. *Brockman Com. Co.,* 107 Mo. App. 418; *Morrison* v. *Ogdenburg & Lake Cham. R. R. Co.,* 52 Barbour, 173.

In the light of these authorities the conclusion is inevitable that the Court should have instructed the jury that the alleged contract was unenforceable because of its indefiniteness, and vagueness in the essentials we have pointed out.

We are conscious of the feeling that apparently the enforcement of these rules of law under the facts of this case, does not do full justice to the parties, yet it is not for courts to make contracts for parties, but to maintain, unimpaired, the established rules of law.

Although we have found it necessary to declare the contract sued upon invalid for the purpose of sustaining an action, yet, nevertheless, we are strongly of the opinion, that, if the facts are as testified to by the appellee and his witnesses, the appellee is not without a remedy. If he were, it would be a sad reproach upon the law. Still of course, assuming the truth of the facts as established by the appellee, we have on one hand a man giving his efforts and time in securing a thing of value for another in addition to giving up that which may have had value to him, with the expectation of full compensation for his efforts and sacrifices, and on the other hand, a party freely accepting and enjoying these, but unwilling to pay therefor. There can be no doubt, that independently of the alleged contract, the appellee has a right

of recovery for the services rendered for the benefit of the appellant, the W., B. & A. Electric R. R., in securing the lease from his aunt for it, as well as compensation for the surrender of his lease to the premises, if he had a lease that had a value. The testimony of the appellee, standing alone, shows that but for him and his peculiar location, the W., B. & A. Electric R. R. Co. would not, nor could not have secured the present site of their station, and it is too clear for argument that some compensation should be due the one whose labor and sacrifice accomplished this result.

Though we, by our *per curiam* heretofore filed, reversed the judgment for the error already indicated, we will remand the case in order to allow the appellee an opportunity to amend his declaration so as to conform to the views herein expressed, or to dismiss the present action and institute a new suit for the recovery of such compensation as shall be found to be due him for what he did towards the securing of the said lease and the surrender of his own lease and possession, whichever he shall prefer.

> *Judgment reversed, case remanded, with leave to amend the declaration, with costs to the appellants.*