## PAUL J. VINCENT *v.* WILLIAM PALMER

[No. 22, January Term, 1941.]

366

*Decided April 9th, 1941.*

The cause was argued before SLOAN, JOHNSON, DELA-PLAINE and COLLINS, JJ.

*Harry E. Goertz* and *Joseph Loeffler,* with whom was *Bernard J. Medairy* on the brief, for the appellant.

*Max Sokol,* with whom were *Dickerson, Nice & Sokol* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Paul J. Vincent, a mechanical engineer and contractor, trading as Paul J. Vincent Company, is disputing the right of the Circuit Court of Baltimore City to order him to account to William Palmer, an employee, for ten per cent of the net profits on contract business from July 1st, 1932, to May 5th, 1939.

The appellant employed Palmer in January, 1932, as a pipe fitter for heating and refrigerating plants at wages per hour. On July 18th, 1932, the appellant made him the following additional offer, which he accepted, applicable to all contract work started after July 1st, 1932:

"In consideration of services rendered and to be rendered we hereby agree to give you ten per cent of the Net profits on Contract Business done by this organization. This agreement to remain in force as long as you remain in the services of this organization.

"It is further understood that in event we do not have sufficient work, which will enable us to pay a fair living wage, you will be at liberty to work for other organizations, but we to have the first call on your services.

"In making this agreement we have in mind the future possibility of you becoming a vital factor and shareholder in this organization."

The appellant, however, testified that some one in his office had given Palmer the following notice on August 25th, 1933: "We are cancelling all agreements made with our erecting force, applying to profit sharing and continuous employment, this is made necessary due to the uncertainty of business, and we want you to feel free, to accept employment elsewhere, if necessary."

Palmer denied that he was given the alleged notice in any way. He declared that when he received from the appellant a letter dated November 30th, 1939, enclosing a copy of the alleged notice, he replied: "I am shocked to receive such a communication from you when you know very well that you sent no letter to me on August 25th, 1933, relative to cancellation, and that you never even

spoke to me about cancellation at any time whatsoever. * * * The agreement of July 18th, 1932, is in full force and effect." Palmer also testified that he had requested his share of the net profits on several occasions, and each time his employer had promised to figure it up and settle later on.

The chancellor decreed on October 17th, 1940, that the employer should account to the employee, and thereupon referred the case to an auditor. Additional testimony was subsequently introduced, but on November 13th, 1940, the chancellor affirmed the decree. The appeal is from the decree and the order affirming it.

Justice Story declared in his Commentaries that courts of equity have jurisdiction in all cases "where there are mutual accounts, * * * and also where the accounts are on one side, but a discovery is sought, and is material to the relief." 1 *Story, Equity Jurisprudence*, sec. 459. In accordance with this view, a court of equity has the undoubted right to require an employer to make an accounting for the purpose of enforcing a binding agreement to pay an employee a portion of the profits of the business. *Legum v. Campbell*, 149 Md. 148, 131 A. 147; *Zalis v. Orman*, 175 Md. 100, 199 A. 877.

The first question presented in this case is whether the profit-sharing agreement is a mere gratuity or a contract with a valuable consideration. Of course, a distinction is recognized between a promise of a gift to an employee for doing what he was already obligated to do, and an offer of a reward to an employee for doing what he was not already obligated to do. In Georgia, for example, where an employer had promised an employee during his employment some indefinite share of profits provided he rendered satisfactory service, but the promise did not necessitate any change in the nature of the employment, it was held that the agreement was *nudum pactum*. *Duncan v. E. H. Cone, Inc.*, 16 Ga. App. 253, 85 S. E. 203. But where an employer promises a bonus to an employee on condition that he shall work continuously for a specified period of time, or until certain work is completed,

and the employee complies with the condition, then the offer and the acceptance thereof constitute a binding contract supplementary to the original contract of employment. *Roberts v. Mays Mills,* 184 N. C. 406, 114 S. E. 530; *Scott v. J. F. Duthie & Co.,* 125 Wash. 470, 216 P. 853. Accordingly the Supreme Court of Wisconsin has said: "To allow the employer in such a case to repudiate liability on the ground stated would come perilously near conniving at the perpetration of a fraud. * * * A binding and enforceable contract to pay a reward rests, on one side, upon a valid offer, and, on the other side, upon an acceptance of such offer * * *. Until acceptance by performance of the services, it is merely a proposition; but when accepted by performance it becomes a binding contract, subject to the laws governing contracts generally." *Zwolanek v. Baker Mfg. Co.,* 150 Wis. 517, 137 N. W. 769, 772. In the present case the employee was under no obligation during the first six months of his employment to give any priority in his services to the appellant. But when the appellant offered him a share in the profits of the business, he relied on the promise and agreed to give "the first call" on his services. This preferential right constitutes a valuable consideration.

The next question to be decided is whether the agreement is sufficiently definite to be enforceable. The law does not favor, but leans against, the annulment of contracts on the ground of uncertainty. If the intent of the parties can be ascertained from the express terms of the contract or by fair implication, the contract should be sustained by the court. *Middendorf, Williams & Co. v. Alexander Milburn Co.* 134 Md. 385, 107 A. 7; *Spicer v. Hincks,* 113 Conn. 366, 155 A. 508. This is especially true of an employer's agreement to pay an employee a share of the profits of the business in addition to his salary, for such agreements tend to create a better understanding between employers and employees and should be sustained by the courts whenever possible. *Williams v. Maryland Glass Corp.,* 134 Md. 320, 106 A. 755. It is true that a hiring at will can be terminated at the

pleasure of either party. *Washington, B. & A. R. Co. v. Moss,* 127 Md. 12, 21, 96 A. 273, 276. But after an employee has rendered services under an express or implied contract, he is entitled to recover for the services he has rendered. *Bull v. Schuberth,* 2 Md. 38; *Given v. Charron,* 15 Md. 502. After a contract has been actually carried out with the acquiescence of all parties concerned, the court should not allow it to be repudiated. *Holloway v. Odgen School District No. 9,* 62 Mich. 153, 28 N. W. 764. If Palmer relied upon the inducement of his employer, and complied substantially with the terms of the agreement, he is entitled to recover for his services. The appellant suggested that the agreement might be considered ambiguous because his own promise to pay a share of the net profits might be held to apply only to those jobs on which Palmer worked. The court is unable to read such a limitation into the agreement, for the appellant agreed to base the percentage on all contract business "done by this organization."

The third question before us is whether or not the parties had rescinded their agreement. To rescind is not merely to terminate, but to abrogate *ab initio.* At common law the parties to a written contract have the right to rescind it by mutual consent, even though there is no provision in the contract permitting them to do so. The parties to a contract may, either in writing or orally, release themselves from its obligations, so far as they remain executory, since the release of one party is sufficient consideration for the release of the other. *Denler & Denler Land Co. v. Eby,* 277 Mich. 360, 269 N. W. 203; *Aetna Life Insurance Co. v. Dodd,* 103 Fed. 2nd 793; *Savage Arms Corporation v. United States,* 266 U. S. 217, 45 S. Ct. 30, 69 L. Ed. 253. However, when a contract has been entered into between competent parties, it is not within the power of either party to rescind it without an option to do so or without the consent of the other party, in the absence of fraud, duress, or undue influence, or unless either party is estopped by his own conduct, or the equities of his position are otherwise such

that he should not be permitted to enforce it. *Loughran v. Ramsburg,* 174 Md. 181, 186, 197 A. 804, 807; *Pitcairn v. American Refrigerator Transit Co.,* 101 Fed. 2nd 929; *Chicago, B. & Q. R. Co. v. State of Nebraska,* 170 U. S. 57, 18 S. Ct. 513, 42 L. Ed. 948. A meeting of the minds is required not only to make a contract, but also to abrogate or modify it after it has been made. *Whiteside v. United States,* 93 U. S. 247, 23 L. Ed. 882; *Utley v. Donaldson,* 94 U. S. 29, 24 L. Ed. 54. Even repeated requests, however annoying, to terminate a contract, do not of themselves constitute ground for rescission. The ground on which the appellant sought to cancel the contract in this case was "the uncertainty of business." It is obvious that a party to a contract has no right to abrogate or modify it merely because he finds, in the light of changed conditions, that he made a bad deal. No court should undertake to redraft a contract merely because one of the parties has become dissatisfied with its provisions. *Cronacher v. Runge,* Mo. Sup., 98 S. W. 2nd 603.

It has frequently been held that the mutual assent requisite to rescind a contract need not be express; it may be inferred from the conduct of the parties in the light of the surrounding circumstances. *Dewey Portland Cement Co. v. Benton County Lumber Co.,* 187 Ark. 917, 63 S. W. 2nd 649; *Johnson v. Stumbo,* 277 Ky. 301, 126 S. W. 2nd 165; 6 *Williston on Contracts,* sec. 1826. If either party expresses an intention to abandon the performance of a contract, and the other party fails to object, there may be circumstances justifying the inference that the other party has assented thereto. Even circumstances of a negative character, such as the failure of both parties to take any steps looking to the enforcement of the contract, may sometimes amount to mutual assent to rescind it. But failure to object to a repudiation of a contract is not in itself a manifestation of assent to its rescission. 2 *Restatement of Contracts,* sec. 406. Thus, even though it be assumed that Palmer received the alleged notice in 1933, it does not necessarily follow that

the contract was rescinded. A mere notice cannot have the effect of rescinding a contract, unless the party giving the notice is entitled to rescind. *Brown v. Roberts,* 121 Cal. App. 654, 9 P. 2nd 517. To establish the rescission of a contract by implication, the acts relied upon must be unequivocal and inconsistent with the existence of the contract, and the evidence must be clear and convincing. *Molyneux v. Twin Falls Canal Co.,* 54 Idaho 619, 35 P. 2nd 651; 6 *Williston on Contracts,* sec. 1828. Therefore, conduct which is not necessarily inconsistent with the continuation of a contract will not be regarded as showing an implied agreement to discharge it, although such conduct might be consistent with an agreement to discharge it. *Duty v. Keith,* 191 Ark. 575, 87 S. W. 2nd 15, 17.

Qualifying the rule that rescission requires the joint will of the parties, the general principle has been well established that if there has been a material breach of a contract, and the injury caused thereby is irreparable, or if the damages that might be awarded would be impossible or difficult to determine, or inadequate, the injured party may invoke the aid of equity to obtain a rescission. *Ady v. Jenkins,* 133 Md. 36, 104 A. 178; *Briggs v. Robinson,* 82 Colo. 1, 256 P. 639; 5 *Williston on Contracts,* sec. 1455. A court, however, will not grant a rescission for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract. *Speed v. Baily,* 153 Md. 665, 139 A. 534; *Barry v. Frankini,* 287 Mass. 196, 191 N. E. 651. Whether a default has occurred sufficient to operate as a discharge of a contract is a question of fact to be determined from the evidence as a whole in each particular case. *Gedanke v. Wisconsin Evaporated Milk Co.,* 215 Wis. 370, 254 N. W. 660. Under the terms of the agreement in this case, Palmer had the privilege of working elsewhere whenever he was not needed by the appellant. On some occasions the appellant waived the right of priority by giving Palmer an extension of time in reporting to work. The appellant testified: "The other people he was work-

ing for were friends of ours. We would not pull him off another job." Nevertheless, Palmer swore that he recognized the obligation to report for duty when called by the appellant, and complied substantially with the obligation. He worked for the appellant at least fifty per cent of the working time during the entire period from 1932 to 1939. The evidence fails to show any such substantial non-performance or breach as would justify rescission by the appellant. An occasional waiver of the right to first call on an employee's services does not warrant a rescission of a contract of employment demanding the first call. *Richard v. American Union Bank*, 253 N. Y. 166, 170 N. E. 532.

The fourth question is whether any portion of Palmer's claim is barred by the Statute of Limitations. In order to escape the bar of the statute in this state actions of account shall be commenced "within three years from the time the cause of action accrued." Code, art. 57, sec. 1. In other words, the statute begins to operate at the time the cause of action becomes vested and enforceable; not from the time of the making of the promise. *Murdock v. Winter's Admr.*, 1 H. & G. 471, 473. When an account is settled between partners, and a balance is ascertained, the right to sue then arises, and from that time the statute begins to run. *Holloway v. Turner*, 61 Md. 217, 223. Where a contract does not mention the period of employment, and the claim of the employee is based upon "continuous employment," indicating one entire contract, even though the work may be interrupted from time to time, the statute will not run until the completion of the contract. *Schaffner v. Schaffner's Estate*, 98 Kan. 167, 157 P. 402; 37 *C. J., Limitations of Actions*, sec. 175. In a case where a bookkeeper for a corporation had been employed to do extra work on the books, for which he was to be paid whatever his services were worth, this court held that the mere fact that the corporation had failed to make any settlement therefor during a period of thirteen years, although he had often asked for payment, would not justify a finding that he

had waived or abandoned the claim. *Richardson v. Anderson,* 109 Md. 641, 651, 72 A. 485, 489. In this case the employer did not specify when he would pay the employee's share. On the contrary, he considered the possibility that the employee might eventually become a vital factor and shareholder in the business, and assured him that the profit-sharing agreement would "remain in force" as long as he continued in the employ of the organization. Palmer's claim to ten per cent of the net profits must necessarily be based upon an accounting to be made by his employer, and no accounting has yet been made. Manifestly, limitations do not run against his claim until an accounting is made or his services are ended.

The final question is whether Palmer's claim was discharged by a general release, which he executed at the appellant's home on the evening of December 19th, 1939. The release was executed in consideration of the sum of $100, and Palmer maintained that he understood the release applied only to the payment of a bonus of $100. The law is well settled in Maryland that if a person, who has executed a release, had ample time to read it and had the capacity to understand it, but negligently and without good excuse failed to inform himself of its exact contents, he cannot subsequently impeach it for his own carelessness or for failure to appreciate the legal effect of his act in signing it, in the absence of fraud, duress, or imposition; for, as a general rule, when one signs a release or other instrument, he is presumed in law to have read and understood its contents, and he will not be protected against an unwise agreement. *Spitze v. Baltimore & Ohio R. R. Co.,* 75 Md. 162, 23 A. 307; *Hammond v. New York, P. & N. R. R. Co.,* 128 Md. 442, 97 A. 1011; *Western Maryland Dairy Corporation v. Brown,* 169 Md. 257, 181 A. 468; 2 *Black, Rescission and Cancellation,* sec. 384. However, it is generally accepted that a release, though general in terms, will be reformed so as to cover merely the right with respect to which the parties were actually dealing. 5 *Williston on Contracts,* sec. 1551. If

both parties have an identical intention as to the terms to be embodied in a release, and the writing executed by them is materially at variance with that intention, either party can have the writing reformed so that it will express the intention of the parties. Likewise, if one party at the time of the execution of a release knows that it does not accurately express the intention of the other party, and also knows what that intention is, the latter can have the release reformed so that it will express that intention. 2 *Restatement of Contracts,* secs. 504, 505. For instance, in a suit for damages which an injured passenger had brought against a railway company, it was held by the United States Supreme Court that the passenger was not bound by a general release which he had executed, if his mind was in such a condition from drugs or whiskey that he could not comprehend what he was doing and he understood that the release included only his medical expenses and his loss of time from work. *Union Pacific R. Co. v. Harris,* 158 U. S. 326, 15 S. Ct. 843, 39 L. Ed. 1003. In the present case Palmer executed the release, without reading it, at a Christmas party where he was drinking heavily. Moreover, he swore that the appellant's bookkeeper, who produced the form and witnessed the release, told him: "It ain't nothing * * *. Go ahead and sign it, Bill * * *. We have to do that on account of income tax." The bookkeeper, when questioned in the court below whether he told Palmer that the release applied only to the bonus, answered that he did not remember. Under these circumstances, it must be held that the release, although pretending to discharge claims of every nature, was in fact intended to cover only the payment of the $100 bonus.

Since it appears that the profit-sharing contract is valid and enforceable, we affirm the action of the chancellor in ordering the employer to make an accounting to his employee.

*Decree and order affirmed, with costs.*