# HARRY B. GIARDINA *v.* THE FARMS COMPANY

[No. 553, September Term, 1974.]

*Decided March 14, 1975.*

The cause was argued before MOYLAN, MENCHINE and LOWE, JJ.

*Hamilton P. Fox,* with whom were *Charles R. Dashiell, Jr.* and *Hearne, Fox & Bailey* on the brief, for appellant.

*Dale R. Cathell,* with whom were *Cathell & Ewell* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

In August, 1968 Harry B. Giardina (Giardina) began employment by The Farms Company (Farms) as its general superintendent. Farms was engaged in the construction of high-rise condominiums in Ocean City, Maryland. Giardina commenced employment during the construction of "Beachmark," continued it during the construction of "High Point," ended it on December 15, 1971 in the course of the construction of "High Point North."

Giardina had been furnished living quarters as a part of his compensation — in the beginning Unit 3 of "Thirteen on the Beach" — from May, 1969 until the present in Unit 4 of the latter condominium. The subject litigation was initiated by Giardina by a bill for specific performance of his allegedly accepted option to purchase Unit 4 for $28,500.00, subject to an annual ground rent of $450.00, from Farms. A counter-action by Farms sought a decree directing Giardina to vacate those premises and an award of damages for his alleged continuing wrongful possession. The Circuit Court for Worcester County by its decree denied the relief prayed by Giardina; ordered him to vacate Unit No. 4, Thirteen on the Beach Condominium; and extended judgment against him for $8500.00 in favor of Farms. Giardina has appealed.

A written option to purchase [1] was executed on September 15, 1969 and reads as follows:

"Received from Harry Giardina, hereinafter referred to as purchaser $10.00 as consideration for an option to purchase the following described property from the Farms Company, hereinafter referred to as Seller.

Townhouse number 4 as shown on a plat

---

1. Both Giardina and Farms agree that there had been an earlier verbal understanding of similar tenor and that it was reduced to writing at the instance of Giardina.

entitled Thirteen on the Beach Condominium at 43rd Street, Tenth Election District, Ocean City, Worcester County, Maryland.

at and for the price of $28,500, to be paid in full at settlement, plus $450.00 annual ground rent.

"This option shall continue in effect during purchasers employment with The Farms Company. Purchaser shall notify seller in writing of his intention to exercise the option before termination of employment. In the event purchaser does not exercise the option, this agreement shall be declared null and void and of no further force or effect and the consideration paid shall be retained as liquidated damages by seller.

"In the event seller [sic] exercises the option, the consideration shall be applied to the purchase price and settlement shall be held on or before 60 days from such notice."

It will be observed: (a) that the option provided that it "shall continue in effect *during purchaser's (Giardina's) employment* with the Farms Company" and (b) that "Purchaser shall notify seller *in writing* of his intention to exercise the option *before termination of employment*." (Italics supplied) On these two phrases "hang all the Law and the Prophets." [2]

### Employment Status of Giardina

The relationship between Giardina and Farms seems to have been most cordial until December 15, 1971. Better understanding of the events of that day requires a brief statement of the chain of command of The Farms Company and the status of construction of High Point North at that point in time. John S. Whaley, president of Farms, also was its principal stockholder. W. L. Griffith, a vice president, was in charge of management of the whole construction operation. Giardina was job superintendent. James Edward

---

2. The Book of Common Prayer.

Lee was assistant job superintendent. Raymond Milton Hindel was foreman in charge of the steel placing crew. As Whaley put it: "Mr. Hindel would obey the orders of Mr. Lee, and both Mr. Lee and Mr. Hindel obey the orders of Mr. Giardina, and everybody obey [sic] the orders of Mr. Griffith and Mr. Griffith obeys [mine]." Whaley thus described the status of High Point North at the time: "We were having serious construction problems at the time, which later would have resulted in [a] very serious financial situation." Griffith pinpointed those problems in the days immediately preceding December 15, 1971 in the following testimony:

> " [O]n the 13th of December, which I believe was a Monday, we were back into operation for the first time after being shut down for over a month when we had problems with the crane. This, as you can imagine in a project, it caused tremendous difficulties. When we got back into operation on the 13th we had been — we were starting to implement a new schedule to try to recover some of the time that had been lost by this crane damage.
>
> "It's my recollection that we really didn't work a full day on Monday, that the crane didn't go in operation until sometime during the day. On Tuesday was the first full day, and I believe it was crucial to this schedule, that we were trying to fulfill, that the night shift work — every part of this schedule had to be fulfilled each day or else the subsequent operations could not take place.
>
> * * *
>
> "I heard on that Tuesday night, I believe it was, that the night shift had been laid off, told not to work by Mr. Giardina. So that after having had the schedule in operation for one day, it was already out of phase.
>
> "Late that night, of Tuesday — I assume this is what you want me to do, is to recount this incident — late that night, of Tuesday, Mr. Giardina came

into the office at 47th Street, and he and I worked together for, I would suppose, several hours. It was quite late. It was after 11:00 when we finished trying to arrive at a method to get ourselves back on the schedule and to get the job back in track, let's say, the following morning."

Griffith then went on to describe his discussion with Giardina on December 15, 1971:

"When I arrived at the job, the following morning, which was Wednesday, the 15th, I saw this, as I arrived, that we were — the job, the operations being performed were not the things that Mr. Giardina and I had discussed late the night before. It was this which led to the conversation that has been referred to here. I would say that it was — I was critical of Harry. I, perhaps, spoke harshly. I had been told that sometimes my appearance is that of being more harsh than I mean to be. But, the substance of what I said to Mr. Giardina was if we couldn't reach an agreement on what we were going to do as late as 11:00 the night before for what we were going to do the following morning, and, then, proceed with it, there was no way that we could make a schedule for the job.

"This is as close as I can recall to my exact words. * * * [M]y recollection is that after that I turned and left the job."

Giardina confirmed his confrontation by Griffith on the morning of December 15, 1971 in the following language:

" * * * so I started to proceed out to the job site when Mr. Griffith came and met me halfway out in the field, and what he said to me, 'I wonder why you can't remember what you did or what you told me eight hours ago', which I had told him the day before how I was going to set up the cranes for the following day and I couldn't remember, he said. He just literally let it go, and said that I wonder why

you can't remember. 'How do you expect to get a building back on schedule if you can't remember what you told me eight hours ago.' "

Giardina then described his immediate reaction to that confrontation:

"I didn't feel good, and I walked away, for I knew being on the job site, like this, sometimes you do get upset and you get mad and you say things you are not supposed to say. The best thing to do is to walk away from it."

Although there is complete agreement that Giardina left the job site at 9:30 a.m. on December 15, 1971 and that he never thereafter performed any services for Farms, the reason for his leaving is a subject of dispute. The resolution of that dispute was a cardinal issue for decision by the trial court. Brief references to some of the testimony on the issue will serve to illustrate the conflict in the testimony:

Giardina: "* * * I went home sick that morning of December 15th. * * * I hadn't been feeling good the day before * * * I guess, about 9:30 or quarter to ten I asked this gentleman to take me home. * * * As I was approaching the trailer, I passed Mr. Whaley coming out of my trailer. I didn't say anything to him. I walked right on by him and went inside my trailer and told Mrs. Thelma Baker [his secretary], I said, 'I don't feel good. I'm quitting for the day, and I'm going to go home.' * * * I asked * * * Bob Robertson to please drive me home. As we walked out the gate I stopped and I said, 'Wait, I have got to make — I have got to get Mr. Lee off the building and tell him I'm leaving.' * * * And I said, 'I'm not quitting, I'm just quitting for the day. I don't feel good.' "

Giardina acknowledged that he had not disclosed either to Whaley or to Griffith that he was ill on the morning of December 15, 1971.

There was testimony by Farms employees in direct conflict with that of Giardina. We shall cite only fragments of such testimony to demonstrate that conflict:

> Lee: "* * * Harry [Giardina] said the hell with this job, that I quit, and was going home, and if anybody wanted him they could come after him. * * * Then I told Harry to go in the trailer and to cool off but he said to hell with it, and left the job."

> Hindel: "* * * Harry came out of the trailer with his hat in his hands and coat on outer arm, waving his arms and he called me. * * * he said * * * 'Get Jimmy, [Lee, then assistant superintendent] I quit * * *.' And I said 'Oh, for God's sakes, go on back in the trailer and sit down and cool off.' * * * Then he said, ' "f" John Whaley, "f" Bill Griffith, and the whole works.' He said, 'I'm quitting. Get Jimmy.' "

The trial judge in the course of his written opinion stated:

> "The threshold question, therefore, is to determine the status of Mr. Giardina with regard to his employment by The Farms Company on and after 10:00 o'clock A.M. on December 15, 1971. The Court specifically finds that Mr. Giardina, as of that time had left the construction site, had quit his job, and had voluntarily left the employment of The Farms Company."

The testimony previously quoted herein demonstrates that there was abundant evidence to support that finding. We cannot find that his conclusion was clearly erroneous. Rule 1086.

Giardina has raised for the first time in this Court, a contention that his employment by Farms was for a definite term and that he was therefore entitled to notice that his services were being terminated. The issue is not before us. Rule 1085. In any event, our examination of the record shows not a scintilla of evidence to support the contention

that Giardina's employment was for a definite term. To the contrary, all of the evidence shows that his employment was for an indefinite term. In the absence of contract or statutory provisions such an employment contract can be terminated at the will of either party. *Washington B & A R. Co. v. Moss,* 127 Md. 12, 21, 96 A. 273, 276; *Vincent v. Palmer,* 179 Md. 365, 370-71, 19 A. 2d 183, 187; *Taylor v. Greenway Restaurant, Inc.,* 173 A. 2d 211 (Mun. Ct. of App., D.C. 1961).

It is quite clear, accordingly, that Giardina, in order to prevail in the specific performance action, must show that there was a lawful acceptance by him of the option granted by the document of September 15, 1969, *supra, before* 10:00 a.m. on December 15, 1971, when his employment was terminated.

### *Acceptance of the Option*

The undisputed evidence shows that the *only written notice* by Giardina to Farms was given on December 16, 1971. Giardina contends, however, that Farms had waived the option requirement that "Purchaser shall notify seller in writing of his intention to exercise the option." He contends further that lawful oral notice had been given, after such waiver and prior to December 15, 1971. Farms denies that it waived the option requirement.

The case of *Bio-Ramo v. Abrams,* 229 Md. 494, 184 A. 2d 831, is precisely on point and provides the rules of law governing determination whether there is a waiver of a requirement for written acceptance of an option. In *Bio-Ramo* it is said at 499, *et seq.* [833-34]:

> "While a contract which is required by the statute of frauds to be in writing may not ordinarily be modified by a subsequent oral agreement, *Abrams v. Eckenrode,* 136 Md. 244, 110 Atl. 468 (1920), the law is well settled that an optionor may, by his words or conduct, waive strict compliance by the optionee of the terms of the option as to a condition precedent, and it is

immaterial that the option is a part of the instrument which is required to be in writing under the statute of frauds.

"In *Achtar v. Posner*, 189 Md. 559, 56 A. 2d 797 (1948), involving an option to renew a three-year lease (made three days before the term began) for another period of three years, upon the giving of written notice within the time specified in the original lease, it was held that a landlord can waive the requirement of written notice from a tenant of his desire to exercise the option to renew the lease and extend the lease upon verbal notice. It is thus apparent that even though the lease in the instant case is within the statute of frauds, as was the lease in the *Achtar* case, there can be an oral waiver of the condition precedent to the exercise of the option contained therein. As was said in the *Achtar* case (at p. 563), it is a matter of proof, that is, whether the testimony will 'reasonably warrant the conclusion that there was a waiver.'

"Other authorities are in accord with the decision in the *Achtar* case. In 2 Corbin, *Contracts*, § 310, it is said:

'If the plaintiff has failed to perform some condition precedent (express, implied, or constructive) to the defendant's duty under the written contract, and that failure was caused by the defendant himself, can the plaintiff get judgment on the written contract without performing the condition? The answer is clearly yes; and the cases generally support the answer * * *. This assumes that the non-performance of the condition was not caused by the plaintiff's own inability to perform, and that but for the defendant's request, agreement, or other conduct, the plaintiff would have performed the condition. If the defendant later repudiates or otherwise

breaks the contract, he cannot use the plaintiff's failure to perform on time as a defense.

\* \* \*

'The foregoing principles apply even where the plaintiff's non-performance of a condition was caused by an oral agreement substituting something else. This is true even though the oral agreement is itself within the statute and unenforceable, and even though it was the plaintiff and not the defendant who proposed the substitution. If the plaintiff would have performed the condition but for the oral agreement with the defendant, he can enforce the written contract.'

"The statement in 4 Williston, *Contracts* (3d ed.), § 595, and the Restatement, *Contracts*, § 224, are to the same effect." (Footnote omitted.)

We will examine the record in the light of that clear authority.

The testimony of Giardina was replete with references to conversations with Whaley relative to acceptance of the option in the years between its execution on September 15, 1969 and the termination of employment on December 15, 1971.

We will briefly show the general tenor of the differing Giardina and Whaley recollections of early conversations and the detailed respective versions of Giardina and Whaley respecting discussions taking place during December, 1971.

*The general*

Giardina: "Q Tell us the first occasion, if you recall it?

A About two year, in 1971, I talked to John one day in the trailer, Mr. Whaley, and I told him that I was thinking of exercising the option

of buying my house and Mr. Whaley had told me at that time I had a good investment, and the property then had increased in value at least $20,000.00, so I had always had at least $20,000.00 equity in the house."

[I was] thinking about exercising the option, * * *. It was a year before this incident."

Whaley: "Q From time to time Mr. Giardina had indicated to you that he wanted to exercise this option, did he not?

A Yes, yes, it seemed to be almost a regular thing to me.

Q So you were aware that it was his intention to exercise the option?

A No.

Q No?

A In other words, if someone says to you frequently that they are, that, you know, they are going to exercise an option, or do anything else, you come to discount it. You don't take it very seriously, and frankly, how I reacted to his telling me that he was thinking about exercising his option. I didn't — all right, I was quite sure that he'd exercise his option at some time in the future, you know, providing everything remained, so he could exercise his option; but I didn't — I never did take it seriously about his meaning to exercise it tomorrow or a specific date.

Q Well, what purpose would the

written notice serve as far as you are concerned?

A  To make me take it seriously."

## The December conversations

Giardina:"* * * in the end of November or the beginning of December I had talked to Mr. Whaley and told him I anticipating [sic] exercising the option on my house.

\* \* \*

The conversation [with Whaley] that I remember the best is the one we had outside the trailer * * * *about the 9th or 10th of December. * * * and I told Mr. Whaley that I had asked Mr. Carlisle to make a letter up to him saying that I was exercising my option.*

And I had told Mr. Whaley, and I said, 'John, I only doing this because it states in my· option agreement.' I said, 'I don't know too much about legal documents, but I do know that if it states in there you should put it in writing, I am doing it that way.' *And, Mr. Whaley looked at me and said that it wasn't necessary, that we understood each other and that was all that was said * * \*. This was in December of 1971.*"

(Emphasis added.)

Whaley: "Q Now, getting back to a meeting prior, or just prior to the 15th of December, I think Mr. Giardina or, in fact, Mr. Giardina thought it was the 9th or 10th — it might

have been the 11th, so I guess 8th, 9th, 10th, or 11th, he stated that he had a meeting with you in which he said that he was going to have Harry Carlisle write a letter exercising the option, and you said it wasn't necessary. Do you recall whether or not he did tell you this about Mr. Carlisle and, if so, what your reply to him was?

A Yes, I have some recollection that he said something about getting Mr. Carlisle to — I don't remember whether it was to write the option or check on the bank or what, but he mentioned Mr. Carlisle in relation to the option. And, I think that I probably responded in the way that I normally thought about it, that I didn't see the point of exercising the option.
Again, I didn't see, really, what good it did him, but it was up to him. * * *

Q Do you ever recall telling him that it wasn't necessary to exercise the option in writing?

A No, I really don't recall telling him that. In listening to the testimony I got the feeling that he was confusing my telling him that I didn't see the point of exercising the option with the necessity of non-exercising in writing. * * *

Q Well, now, did there come a time when Harry Giardina told you

that he was having Harry Carlisle prepare the written exercise of the option?

A   I believe so. I don't have a very specific recollection about that, but I do think that he did tell me that.

But, once again, Mr. Fox, you have to understand the timing and the circumstances. I believe we were — it's difficult to reconstruct this. It's somewhat an emotional time, but our principal concern at that time in December was to get this job back on some kind of a proper footing, and I considered the job to be in very — to be in very deep and serious trouble.

Talking about an option in that period of time, I mean, it would have required something like an exercise in writing before it really — before I would have taken it seriously, particularly in view of the history.

In other words, Mr. Giardina could have said to me that he was having Harry — what I seem to recall, he wanted Harry to write the option, and *I told him I didn't see what the necessity of having Harry write the option. He could write it himself. It only took one sentence.* And, so, I think, he probably did say something to that effect to me, but I didn't — again, I didn't consider it an exercise of the option in the context.

It came as something that he had done before, and it came at a time when everyone's focus, including his, I presume, was on the other problems that didn't relate to this." (Emphasis added.)

*Bio-Ramo v. Abrams, supra*, said (p. 500 [834]): "* * * it is a matter of proof, that is, whether the testimony will 'reasonably warrant the conclusion that there was a waiver.'" There can be no doubt that the testimony of Giardina, if believed, would permit of a factual conclusion that Whaley in December, 1971 had waived for Farms the requirement for written acceptance of the option. There equally can be no doubt that the evidence would permit of a factual conclusion to the contrary. The written opinion of the trial judge thus resolved this factual issue:

"The Court turns now to a brief consideration of the efforts made by Mr. Giardina to furnish the written notice to exercise the option. Mr. Giardina, incidentally, attempts to establish a waiver of this written intention through testimony with regard to several conversations between himself and Mr. Whaley. Mr. Whaley, of course, does not agree with the substance, content, or intent of those various conversations. Sometimes, however, actions speak louder than words, and it is difficult for the Court to reconcile Mr. Giardina's position of waiver with his frantic efforts between December 13th and December 15th to secure a written document.

"Mr. Giardina, himself, testified that he had called Mr. Harry T. Carlisle two or three times with regard to this letter, and that, on one occasion, he called the bowling alley, where he might find Mr. Carlisle, at the suggestion of Mrs. Carlisle. Mr. Carlisle testified that the first record of a call from Mr. Giardina to ask that he prepare the written exercise of the option was on December 13th. On December 14th, between 7:00 o'clock P.M. and 9:30

P.M., his wife received a call at their home from Mr. Giardina, whereupon, she gave Mr. Giardina the bowling alley number, at which Mr. Carlisle was reached. According to Mr. Carlisle, Mr. Giardina's voice exhibited a great amount of anxiety. On December 15th, at about 4:30 P.M., he received another call from Mr. Giardina, and, at that time, promised him that he would have the letter in Mr. Giardina's hands the next morning. On that morning, Mr. Carlisle asked his associate, Mr. David Day, according to Mr. Day, to wait in the Salisbury Office until the letter could be typed, take it to Mr. Giardina, have it signed, and deliver it to Mr. Whaley. This activity was completed before lunch, but Mr. Day does not remember what he did with the letter. Mr. Whaley remembers receiving the letter from Mr. Day, and replying, 'that's null and void.' No definite reason can be ascribed to Mr. Giardina's flurry of activity, in this regard, at this crucial point in time, but it is sufficient to excite one's curiosity and suspicion. It does prove, however, that Mr. Giardina did not seriously believe that the requirement for a written notice to exercise the option, as clearly specified in the agreement, had been waived. The Court specifically finds that the Complainant has failed to prove by a fair preponderance of the credible evidence, to thus persuade the Court, that the requirement for written notice had been waived by Mr. Whaley as President of The Farms Company."

That Giardina had asked Harry Carlisle to prepare a written acceptance of the option prior to December 15, 1971 is uncontroverted. This circumstance does not, however, improve Giardina's position. There is not a scintilla of evidence that Carlisle possessed the real or apparent authority to bind Farms to a waiver of the requirement for written acceptance of the option. Thus, a verbal notice to Carlisle was of no greater effect than a verbal notice to Whaley.

We find no error of law by the trial judge. Under such circumstances, we are not permitted to substitute our judgment for that of the chancellor. In *Schremp v. Dubrowin*, 257 Md. 623, 263 A. 2d 827, it was said at 632 [831-32]:

"As to the chancellor's findings of fact this Court has unequivocally stated many times that it is bound by those findings unless it appears that the court below was *clearly erroneous*. Rule 886, Maryland Rules of Procedure. Examining Judge Macgill's findings and the Schremps' contentions in this light, we find no basis for holding the chancellor's factual determinations to be clearly erroneous. It is true, as the Schremps claim, that there is much conflicting evidence in the case from which the lower court might have drawn different conclusions. However, the weighing of conflicting evidence is entrusted to the chancellor alone, for only he has had the first-hand opportunity to judge the credibility of all the evidence and the inferences to be drawn from the evidence. We believe that the record clearly shows that the chancellor carefully detailed and weighed all of the evidence on each issue and was amply supported in each of his findings of fact by evidence in the case.

Similarly, in the subject case, the trial judge correctly ruled that the right of Giardina to specific performance turned upon the question whether there was a waiver of the necessity for written notice of acceptance. On the basis of conflicting evidence he concluded that Giardina had failed in his burden of proof. We cannot say his conclusion was clearly erroneous. Maryland Rule 1086.

*Judgment affirmed.*
*Costs to be paid by appellant.*