# J. HARRY WILLIAMS

## *vs.*·

# THE MARYLAND GLASS CORPORATION AND ISAAC E. EMERSON.

*Corporations: no implied power to purchase own stock; stock issued conditionally; returned to corporation. Contracts: substitution and discharge. Employment: profit-sharing; resignation or discharge of employee.*

A contract may be discharged by a change of parties, as by a substitution of a new party by the agrement of all.        p. 327

In such cases all must agree; but the assent may be implied, and such substitution and discharge arrived at or shown by circumstances and conduct of the parties amounting to acquiescence.        p. 327

Corporations, in the absence of special authority, have no power to purchase their own stock.        p. 328

But stock may be issued conditionally to be returned to the company upon the happening of the event specified in the contract.        p. 330

Contracts by which employees are paid a salary and also a share of the profits are mutually beneficial, and are to be sustained by the courts.        p. 330

Where an employee notifies his employer that he will resign unless his salary be raised, and does in fact resign when he fails to get an advance, he can not complain that he was unjustly discharged.                                              p. 331

*Decided April 9th, 1919.*

Appeal from the Circuit Court of Baltimore City. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS and URNER, JJ.

*Arthur W. Machen* and *Raymond Williams* (with whom was *Herbert C. Forrester* on the brief), for the appellant.

*George Ross Veazey* and *Vernon Cook,* for the appellees.

BURKE, J., delivered the opinion of the Court.

This suit involves the ownership of forty shares of the capital stock of the Maryland Glass Corporation, incorporated under the Laws of Maryland. This stock at one time appeared upon the books of the corporation in the name of J. Harry Williams, the appellant, but was subsequently transferred to Isaac E. Emerson under the circumstances hereinafter stated.

The primary object of this suit, as appears from the bill of complaint, is to obtain a decree requiring the defendants to restore the appellant's name to the registry or list of stockholders in the defendant company, and to accord to him all the rights of such stockholder in respect to said forty shares

of the capital stock of the said company, and requiring the defendant company to issue to him a certificate for said forty shares, and that the transfer of said shares to Isaac E. Emerson may be cancelled and annulled.

A statement of such facts as appear to us to be necessary to present the questions raised upon the record will now be made. In 1907 Isaac E. Emerson founded and organized a corporation for the purpose of manufacturing glass bottles. This corporation was incorporated under the laws of New Jersey, and its corporate name was The Maryland Glass Corporation. Its plant was located at Mt. Winans, Maryland, and its capital stock was one hundred thousand dollars divided into one thousand shares of the par value of one hundred dollars each. Practically the whole capital stock was owned by Mr. Emerson,—he having furnished all the money for the erection of the plant and starting the business of the company. Mr. Emerson did not understand the business of manufacturing bottles, and wanted a capable and experienced man to take charge of the plant. The appellant was recommended to him as a qualified man for that position, and on January 17, 1908, the Maryland Glass Corporation of New Jersey and J. Harry Williams, the appellant, entered into the following agreement:

"This memorandum of agreement, made this 17th day of January, 1908, by and between the Maryland Glass Corporation, hereinafter referred to as The Corporation, party of the first part, and J. Harry Williams, hereinafter referred to as the Manager, party of the second part, witnesseth:

"The Corporation agrees to employ the Manager for a period extending from November 1st, 1907, to August 31st, 1908, as Manager of its glass plant at Mt. Winans, Md., after its erection, and as supervisor of its construction, up to that period, and the party of the second part agrees to accept this position upon the following conditions:

"The Manager agrees to take charge of manufacture of all bottles produced at above works, make all

glass, hire all blowers, hire all other labor and office
force necessary, except as hereinafter specified, do all
other work in connection with plant, and devote his
entire time to the management and promotion of busi-
ness established as above to the exclusion of all other
business, in consideration of which services he is to
receive a monthly salary of two hundred and fifty
($250.00) dollars, payable on the last day of each
month during continuance of this agreement.

"The Manager further agrees that all bottles pro-
duced under his supervision shall be of first-class mer-
chantable quality, equal in all respects to bottles sub-
mitted as examples by Emerson Drug Company, with
usual allowance for defective ware, and that same shall
be produced as cheaply as could be done with like facili-
ties by anyone.

"At the expiration of the above period, if the serv-
ices of the Manager have been satisfactory to the Cor-
poration, this contract shall be continued for an addi-
tional term of one or more years at the same salary as
above, and it is further agreed that on Aug. 31st, 1908,
in the consideration of the proper fulfillment of his
duties as Manager, the Corporation shall transfer to
the Manager forty (40) shares of the capital stock of
The Maryland Glass Corporation, such shares to be
paid for by him out of the dividends of the said Glass
Corporation on said forty shares in which the Manager
shall share from date of transfer. As security for pay-
ment of such shares the Manager shall give his prom-
issory note payable on demand with the above stock as
collateral which shall be released in full on complete
payment for aforesaid stock, and the Manager agrees
further, should he at any time cease to be in the serv-
ice of the Corporation, then that Corporation is hereby
given an option of thirty days on stock in his posses-
sion at par value.

"The Corporation reserves the right to select its own
bookkeeper and timekeeper, whose duties shall consist
in making up all payrolls, checking up all accounts,
and shipping and receiving all goods to and from fac-

tory, and also the right to reject any skilled or un-
skilled labor, the employment of which on account of
color, race or any other reason may in the opinion of
the president of the Corporation, be unnecessary or
prejudicial to the working interets of the Corporation.

"All skilled labor to consist of Union men in good
standing.

"All goods are to be purchased at main office, requi-
sition for same being made by Manager.

"The Corporation agrees to purchase first-class mate-
rial such as is required to make glass of a nature sim-
ilar to that used by the Emerson Drug Company at
present time.

"Should either of the contracting parties desire, at
the expiration of time herein specified, to cancel this
agreement, same can be done by giving sixty days' no-
tice in writing.

"The appointment of applicants to positions, other
than that of blowing, shall be subject to approval of
president, as shall also all salaries and wages not fixed
by the Union."

By three endorsements entered upon the contract made
*during the existence of the Maryland Glass Corporation of
New Jersey* the salary of Mr. Williams, the manager, was
increased. By the first memorandum, dated September 13th,
1910, his salary was increased to three hundred dollars per
month; by the second, dated August 5th, 1912, to three hun-
dred and thirty-three dollars and thirty-three and one-third
cents per month; and by the third, dated 30th of March,
1914, to three hundred and seventy-five dollars per month.
On August 31st, 1908, in pursuance of the contract forty
shares of the capital stock of the Maryland Glass Corporation
of New Jersey were transferred to J. Harry Williams. At
that time the whole capital stock of the corporation had been
issued, and these forty shares were taken from the holdings
of Isaac E. Emerson. Mr. Williams then delivered to Mr.
Parker Cook, as agent for Isaac E. Emerson, the following
promissory note:

"$4,000.        Baltimore, Maryland, August 31, 1908.

"On demand after date, I promise to pay to the order
of Isaac E. Emerson four thousand dollars and have
deposited as collateral forty shares of Maryland Glass
Corporation stock.

                              "J. H. Williams."

At the same time he endorsed in blank the certificate of
stock, and delivered it to Mr. Cook, who put the certificate
with the note as collateral security. The note and certificate
were kept together in a vault of the Emerson Drug Company
in a drawer marked with the name of Isaac E. Emerson.
The corporation was very successful, and paid large divi-
dends. Mr. Williams received three checks for one thousand
dollars each, dated respectively September 3, 1910, Novem-
ber 19, 1910, and July 17, 1911, as dividends on his stock.
These checks were endorsed by him to the order of Isaac E.
Emerson, and the note was credited with the amount of each
check. There remained due on the note the sum of one thou-
sand dollars which Mr. Emerson never demanded, although
other dividends were paid to Mr. Williams on the stock which
he was permitted to use as he saw fit.

In December, 1914, the officers of the Maryland Glass
Corporation of New Jersey determined to incorporate under
the laws of Maryland, and a few days prior to December
31st, 1914, the Maryland Glass Corporation of Maryland was
incorporated under the laws of this State. The amount of
its capital stock was the same as the New Jersey corporation,
and its officers were the same, and for all practical purposes
it was identical with the New Jersey company. On Decem-
ber 31st, 1914, the *Maryland Glass Corporation of New Jer-
sey* submitted to the Maryland Glass Corporation, incor-
porated under the laws of Maryland, the following proposi-
tion:

"The undersigned does hereby offer to sell, assign
and transfer to your company the following described
property, to wit: All the real estate, buildings, im-
provements, machinery, plant, tools, implements and

chattels of every kind, and all of the book accounts, cash on hand, good-will, contracts and all other property and assets, real, personal or mixed, of every kind and description whatsoever, of the Maryland Glass Corporation, a corporation formed under the laws of the State of New Jersey, in consideration of the issue of shares of stock of your company, as follows:

"To Isaac E. Emerson...............740 shares
"To Philip I. Heuisler...............140 shares
"To Joseph F. Hines................ 40 shares
"To Parker Cook................... 40 shares
"To J. Harry Williams.............. 40 shares.

"And upon the further condition that your corporation by the acceptance of this offer assume all the debts, contracts, and obligations of every kind of the undersigned corporation, and shall pay the same as they mature. Maryland Glass Corporation, a corporation formed under the laws of the State of New Jersey.

"And further resolved, that in the event of the acceptance of said proposition that the officers of this company be and they are hereby authorized and directed to execute all necessary deeds, conveyances, assignments or papers of any kind necessary to carry out and effectuate the purpose of this resolution."

This offer was accepted by the Maryland Corporation, the property transferred and the stock of the new corporation issued to the stockholders of the old, share for share, as provided in the above proposition. Mr. Williams' certificate, No. 15, for 40 shares in the New Jersey corporation was cancelled, and a new certificate, No. 10, for forty shares in the new corporation was issued to him which he endorsed in blank and which was attached to and put with the promissory note above mentioned as collateral security, and the new certificate and note were kept together in the private drawer of Isaac E. Emerson. Sometime after this sale, the New Jersey corporation was dissolved. Mr. Williams knew of the incorporation of the new corporation, he accepted stock in it, he attended its first stockholders meeting, he remained with the

new company as he did with the old, performing precisely
the same duties.   After the incorporation of the Maryland
corporation the following and last endorsement was made
upon the original contract:

> "It is understood and agreed this 16th day of March,
> 1916, that from and after February 1st, 1916, the
> salary of J. Harry Williams, under the aforegoing
> contract shall be four hundred sixteen dollars sixteen
> and two-thirds cents ($416.16⅔) per month.   In all
> other respects, the aforegoing agreement is continued
> in force as heretofore."

We here quote from the fifth paragraph of the bill:

> "After the last memorandum or rider endorsed upon
> said contract between the plaintiff and the New Jer-
> sey corporation, to wit, in or about August, 1917, your
> orator's salary as manager of said defendant corpora-
> tion was further raised to $500 per month, but no
> memorandum or rider to that effect was endorsed
> upon said contract, and no written agreement was
> entered into in respect to the matter, and no agree-
> ment was made for the extension of the said contract.
> In or about December, 1917, your orator's salary as
> manager of said defendant company was further raised
> by the amount of $1,000 per annum, but no written
> agreement was entered into in respect to the matter,
> and shortly thereafter this latter increase was can-
> celled by the defendant corporation, which thereafter
> paid the plaintiff at the former rate of $500 per
> month."

A contract may be discharged by a change in the parties
thereto, as by the substitution of a new party in the place of
one of the original parties by agreement of all, although the
terms otherwise remain the same.   All must agree for it re-
quires the consent of all of the original parties to change the
old contract, or their relations to it and extinguish the liabil-
ity; and of the parties to the new contract to create it.   But
such assent may be implied and such a substitution and dis-

charge may arise or be shown by circumstances and conduct of the parties showing an acquiescence in the change. 3 *Elliott on Contracts,* sec. 1867. The legal effect of the above facts was to adopt the contract of January 17, 1908, as the contract between the plaintiff and the Maryland corporation subject however, to the increase in salary mentioned. This was the obvious purpose and intent of all the parties to the contract.

J. Harry Williams ceased to be in the service of the corporation some time between the 11th and the 20th of May, 1918, and the corporation, within thirty days after he had ceased to be in its service, both verbally and in writing, offered to avail itself of the option to take over the forty shares of stock at its par value, as provided in the contract. It is contended that this option cannot be exercised by the defendant corporation for three reasons: *First,* because it is an option reserved to a Maryland corporation to purchase its own stock; *secondly,* because the option reserved must be treated as a forfeiture, and as such unenforcible in a Court of Equity; and *thirdly,* because the plaintiff's connection with the corporation was terminated by the unlawful act of the defendant. The plaintiff contends that he was wrongfully discharged. The first and second reasons present questions of law, and the third a question of fact. As to the first reason. It must be admitted that if this is a contract by a Maryland corporation to purchase its own stock, or a reservation by such corporation of an option to purchase its own stock it is illegal and void under the principles declared in repeated decisions by this Court. *Md. Trust Co.* v. *Natl. Mechanics Bank,* 102 Md. 608; *Burke* v. *Smith,* 111 Md. 624; *Peninsula Trust Co.* v. *Johnson,* 128 Md. 535. In the last cited case it is said: "In *Burke* v. *Smith,* 111 Md. 624, we said it can not be doubted at this date, since the decision of this Court in the case of *Maryland Trust Company* v. *Mechanics Bank,* 102 Md. 608, that in the absence of express authority a corporation in this State, the amount of whose capital stock is fixed by its charter, has no power to purchase its own

shares, either for the purpose of holding or selling them, or for the purpose of cancelling them and retiring them; and that the amount of the capital stock of a corporation can not be lawfully diminished in any other mode than by that described by the Code of Public General Laws, Article 23." The contract which was declared illegal and void in the *Maryland Trust Company's case, supra,* as well as the result intended to be accomplished was wholly unlike the contract in this case. That contract, as stated by JUDGE McSHERRY, was: "Put in the simplest and plainest form the contract provided, that the bank was to furnish the money necessary to enable the Maryland Trust Company to have its own stock purchased on the Stock Exchange through agents who would not disclose the fact that they were buying for the trust company, in order to create the impression upon the public and particularly in the minds of the holders of the minority of the guardian stock, who had indicated an unwillingness to exchange their shares for Maryland Trust stock, that there was a demand for the Maryland Trust stock in excess of what the real demand was, and thereby to bring the guardian stockholders in, and to hold the market against the anticipated Hambleton raid. The further effect of the contract was to reduce, by the number of shares purchased under it, the capital stock of the Maryland Trust Company and to withdraw from its creditors and depositors and the remaining shareholders the protection of the double liability clause of the statute, to the extent of over two hundred and sixty thousand dollars." There the shares had been issued and had presumably been paid for. Here there had been no absolute sale or delivery of the shares to Mr. Williams, and he had no absolute interest in them. His interest was merely a qualified one which was liable to be defeated upon the happening of the contingency expressed in the contract, viz: should he cease to be in the services of the corporation. By reason of the dissimilarity in the contracts and in the facts of the two cases we do not regard the Maryland Trust Company case and the cases following it as controlling authorities in this.

We construe the contract under consideration, so far as relates to the stock in question as in legal effect, a conditional sale of forty shares to Mr. Williams. There is no case in this State which holds such contracts illegal, and they have been upheld in other jurisdictions, where, as in Maryland, there is a statute prohibiting a corporation from purchasing its own stock; provided, however, the rights of the creditors are not prejudiced. *Vent* v. *Deluth Coffee and Spice Company,* 64 Minn. 307; *Royal Glue Company* v. *Lange,* 40 App. D. C. 9; *Porter* v. *Plymouth Gold Min. Co.,* 74 Pac. 938; *Ophir Consol. Mines Co.* v. *Brynteson,* 143 Fed. 829; *Schulte* v. *Boulevard Gardens Land Company,* 164 Cal. 464; *S. C. Anno. Cases,* 1914 B. 1013. These cases support the validity of the contract upon the ground that the sale or transfer to the plaintiff was conditional, and that he never became a stockholder except subject to the qualification that his stock might be returned to the company upon the happening of the event specified in the contract, and such a contract is not prohibited by Article 23 of the Code.

As to the second reason. We do not find anything to support the suggestion that the option agreement is in effect a forfeiture. It was in effect a profit sharing contract under which Mr. Williams, so long as he remained in the services of the corporation, was to be paid a fixed salary plus a portion of the profits. Such contracts are beneficial to both employer and employee, and should be sustained by the courts, where it is possible to do so.

As to the third reason. The testimony in the case fails to support the allegation that the plaintiff was wrongfully dismissed from the services of the corporation. No useful purpose would be subserved by discussing the testimony bearing upon this controverted question of fact, but we are satisfied that in the interview at the Emerson Hotel, the plaintiff gave Mr. Heuisler, the president of the defendant corporation, to understand that he intended to resign if his request for a liberal increase of salary was not promptly granted. That he intended what he told Mr. Heuisler to be a notice of his

intention to resign, if the corporation refused to increase his salary, is confirmed by his letter of June 3, 1918, to Mr. Burt, in which he said: "My single regret is that I did not leave them years ago," and in a subsequent letter to Mr. Burt he wrote: "So that when they were not inclined to advance my salary in common with every other person about the plant there was nothing for me to do but resign, which I should have done years ago." In view of his own declarations he cannot be heard to complain that he was wrongfully dismissed.

After the plaintiff had ceased to be connected with the corporation he was tendered a check for three thousand dollars in payment of his stock,—that sum being the par value of the stock less the sum of one thousand dollars due on the note which was also tendered him. He declined to accept the check and note, and the stock was transferred to Isaac E. Emerson on the books of the corporation.

By the decree of the Court below the bill of complaint was dismissed with costs; "without prejudice, however, to the right of the plaintiff to collect and receive the par value of the stock issued to him, less any balance due by him on the promissory note mentioned in the evidence." For the reasons herein stated the decree will be affirmed.

*Decree affirmed, with costs.*