GREENBELT ELECTRIC COOPERATIVE, INC., Appellant,

v.

Bill JOHNSON, Appellee.

No. 9156.

Court of Civil Appeals of Texas, Amarillo.

Oct. 31, 1980.

Underwood, Wilson, Berry, Stein & Johnson, R. A. Wilson, Amarillo, for appellant.

Lowe & Courtney, Jerry D. Courtney, Clarendon, for appellee.

REYNOLDS, Chief Justice.

By this limited appeal, Greenbelt Electric Cooperative, Inc. seeks to overturn a judgment, rendered on a jury verdict, decreeing its monetary liability for breach of contract to furnish electric service to Bill Johnson. Because Johnson failed to prove a contractual duty by Greenbelt to furnish him electric service, we reverse and render.

In 1972, Johnson began the operation of Syd Blue's Restaurant and Lounge in a building situated in Howardwick, Donley County. By written instrument, the building was leased to Johnson by George Howard, the owner, for a five-year term. On 24 March 1972, Greenbelt and Johnson contracted in writing for the furnishing and use of electric power and energy for the building. The contract was for a term of five years "and thereafter until terminated by either party giving to the other _____ months notice in writing." A provision in the contract, known to Johnson at all times, specified that the bill for service shall be paid

Monthly on the 25th of each month or as soon thereafter as the bill is received and 10% penalty will be added if not paid by the 10th of the following month, with service being disconnected on the 21st if no payment is received.

Greenbelt's billings, made to Syd Blue's Restaurant and Lounge, were paid by draft drawn on Johnson's bank account.

In August of 1974, Johnson sold the business to Olin Castleberry, who began operating it at that time, although the written instruments of the transaction are dated 31 October 1974.[1] Johnson retained a security interest in the personalty sold to secure the payment of the deferred portion of the purchase price. The contract of sale contained Johnson's agreement not to participate in a competing business within a fifty mile radius of Howardwick for a period of three years. Johnson ceased paying rent under his lease with Howard and, at Johnson's request, Howard substituted Castleberry as the tenant with a new five–year lease beginning in August, 1974.

At the time of the sale, Johnson contacted Greenbelt, advising the office manager of the sale to Castleberry and that "the meter needed to be read out, and the future bills would be billed to him [Castleberry]." It was established that Johnson did not request the termination of his contract with Greenbelt. Johnson testified he did not intend that his contract with Greenbelt be terminated, and he intended to re–take possession if Castleberry defaulted. Johnson received the final bill requested and he did not, nor expect to, receive any more bills. He acknowledged that the payment of future bills would be between Greenbelt and Castleberry.

Castleberry executed an application for membership in Greenbelt, agreeing to purchase all electric energy used on the premises, and paid his membership fee in August, 1974. Castleberry did not pay for his electric usage from January 5 to February 5, 1975.[2] A collection notice, which would have been mailed March 14 under Greenbelt's procedure, was received by Greenbelt's area service representative, who went to see Castleberry. Castleberry said he would pay the bill the next day, but did not and, when again contacted, he requested, but was denied, another extension.

Meanwhile, about the first week in March, Castleberry had defaulted in his payments to Johnson. When, on or about March 6, Johnson inquired, Castleberry said he could not afford the payments, adding, "I am busted. I am through. It is all yours." Castleberry gave the keys to Johnson.

Later, Johnson went upon the premises to clean up the equipment. He observed the perishable merchandise was stored in the freezers and iceboxes and there was electricity to the building. During the cleaning some two or three days before March 20, Johnson, who was not going to use the building any more, arranged with Howard to put a food service, a steak house, in the back of a nearby building being used as a lounge. Johnson was going to use the equipment and merchandise in the operation of the steak house, and Howard agreed the merchandise could be left while Johnson was remodeling the back portion of the nearby building. Johnson began remodeling on March 20, working several hours each day without going back to the building Castleberry had vacated until the first day of April. During this period of time, Johnson made no inquiry to Greenbelt; and neither he, nor anyone else so far as he knew, informed Greenbelt, and Greenbelt did not know, that perishables had been left in the building.

Because, according to Greenbelt's records, the $383.18 Castleberry owed for electric usage since January 5 remained unpaid on March 31, the area representative was instructed to "pull the meter." He did so, as

---

1. The instruments reveal that the wives of Johnson and Castleberry were parties to the transaction; however, consistent with the litigants' references, the designations of names will be in the singular.

2. Unless otherwise noted, all dates hereafter recorded are in the calendar year 1975.

recorded, on March 31. Greenbelt gave no notice to nor contacted anyone at that time; however, some two hours later, Howard, who fixed the date as March 20 or 21, became aware that the electric service was terminated. He inquired of, and was informed by, Greenbelt's representative of the reason. Howard then requested the reinstallation of the meter because his son, Jeff Howard, "was going to open [a beer and wine store in the building] in about ten days." After being told that Castleberry's bill would have to be paid, Howard asked the representative to see his son. Jeff Howard, fixing the date as March 19 or 20, requested electric service to the building for his proposed operation, and was told that Castleberry's bill would have to be paid before service would be supplied to the building. No one reported these events to Johnson.

When Johnson returned to the building on April the first, or perhaps the second, he found the perishable food was spoiled. In his opinion, the electricity had been off for several days. The perishables had a pre-spoilage value, he opined, of about $4,000.

Thereafter, the cause underlying this appeal came before the court on pleadings filed by Johnson and others.[3] In answering the special issues submitted on the cause, the jury found that (1) at the time the meter was removed, Johnson and Greenbelt had a contract for Greenbelt to furnish electric service to the building; (2) the removal of the meter by Greenbelt was a breach of such contract; and (3) Johnson suffered damage as a result of the breach (4) in the amount of $4,000.[4] Judgment was rendered on the verdict, decreeing, *inter alia*, that Johnson recover $4,000 from Greenbelt, to which Greenbelt has limited its appeal.

■ The threshold inquiry is whether Greenbelt was obligated by the 1972 contract to furnish Johnson electric service at the time the meter was removed in 1975. Johnson supplies an affirmative answer on the theory that the meter was placed at his request and serviced under the contract, he had committed no breach, and neither party had notified the other of the termination of the contract. A negative answer is required, Greenbelt theorizes, because Johnson and Greenbelt had no contract at the time the meter was removed, the substitution of Castleberry for Johnson as a party to the contract operating, if not to terminate the contract,[5] at least to amend or

---

3. The litigation was postured for trial on pleadings by Jeff Howard, Syd Blue's Corporation and Bill Johnson for injunctive relief against and monetary recovery from Greenbelt, and Greenbelt's verified answer. Jeff Howard and Syd Blue's Corporation sought, in brief, to permanently enjcin Greenbelt from discriminating against them in furnishing electric service in the Howardwick area; Jeff Howard and Johnson sought monetary damages from Greenbelt for its failure to furnish them electric service. The judgment rendered on the jury's verdict permanently enjoined Greenbelt from discriminating against Syd Blue's Corporation by requiring Greenbelt to supply electric power and energy to the corporation on the same basis service is supplied to other commercial users in the area of Howardwick, denied Jeff Howard any monetary recovery, and granted Johnson the monetary recovery that is the subject of this appeal. Greenbelt has not appealed from the permanent injunction aspect of the judgment, Jeff Howard has not appealed from his take -nothing adjudication, and these two phases of the litigation will not be further noticed.

4. Johnson also pleaded a cause of action grounded on negligence; but, this independent ground of recovery was waived when Johnson did not request, and the court did not submit, special issues on the negligence theory. Tex.R. Civ.P. 279.

5. Johnson submits that Greenbelt did not plead either a rescission or termination of the contract, tacitly indicating that Greenbelt's reliance thereon is foreclosed. Procedurally, any "matter constituting an avoidance or affirmative defense" is to be specially pleaded. Tex.R. Civ.P. 94; *Wilson v. Remmel Cattle Co., Inc.*, 542 S.W.2d 938, 942 43 (Tex.Civ.App. Amarillo 1976, writ ref'd n. r. e.). Yet, despite the failure to plead an affirmative defense: a general denial authorizes introduction of evidence showing a different contract than, or even abandonment of, the contract sued upon, *Goodwin v. Biddy*, 149 S.W. 739, 740 (Tex.Civ.App. - Amarillo 1912, no writ); a failure to object to evidence of the matter on that ground waives the pleading requirement, *Phillips v. Woodard*, 306 S.W.2d 229, 237 (Tex.Civ.App. Texarkana 1957, writ ref'd n. r. e.); an affirmative defense may be tried by consent absent pleadings, *Whitley v. Whitley*, 566 S.W.2d 660, 662 (Tex. Civ.App. -Beaumont 1978, writ ref'd n. r. e.);

modify it to provide that Castleberry was the one to whom service was furnished and terminated for nonpayment.

It is unprofitable to speculate on the matter of a rescission or termination of the 1972 contract[6] inasmuch as the parties themselves do not seriously contend for an intent to void the contract *per se.* *Cf.* *Southern Travelers' Ass'n v. Wright,* 34 S.W.2d 823, 826 (Tex. Com'n App.1931, holdings approved) (holding that the consent of both parties is required to annul their contract). Johnson testified that by his August, 1974 conversation with Greenbelt's office manager, he did not intend, and Greenbelt agreed that he did not request, the termination of the contract. Greenbelt still relies on the contractual provision specifying its right to discontinue service for nonpayment.

■ Instead, the record appropriately invites an address to the legal consequences of the August, 1974 conversation. Indisputably, Johnson requested, and Greenbelt acquiesced, on the premise that Johnson had sold his business to Castleberry, that only a final bill was to be sent to Johnson and all future bills for the electric service were to be furnished to Castleberry. Johnson did not expect to receive any other bills and he acknowledged that the future bills would be a matter between Greenbelt and Castleberry. Accepting, in conformity with the actual position taken by the parties, that the conversation did not result in a termination of the 1972 contract, then the parties effected its continuation except as changed. By their conversation, the parties unambiguously consented to substitute Castleberry in the place of Johnson as a party to the contract. By mutually consenting to the substitution, the parties modified the contract to that extent, 17A C.J.S. Contracts § 373 (1963), there being the prerequisite meeting of minds for the modification. *Southern Travelers' Ass'n v. Wright, supra,* at 826. And the parties had the right to orally modify the contract, which was not one required to be in writing, even though it was a written contract. *Rhoads Drilling Co. v. Allred,* 123 Tex. 229, 70 S.W.2d 576, 583 (1934).[7]

■ Given the contract as modified, its construction becomes a law question. *Maddox Motor Co. v. Ford Motor Co.,* 23 S.W.2d 333, 337–38 (Tex. Com'n App. 1930, holdings

and if a plaintiff pleads anticipated defensive matters, the defendant may rely upon the defenses even though his only pleading is a general denial. *Raney v. White,* 267 S.W.2d 199, 200 (Tex.Civ.App.–San Antonio 1954, writ ref'd). In this cause, Johnson specifically pleaded that "[n]either party ever terminated said contract or gave the other notice of termination," and he does not suggest that evidence bearing on the nonpleaded matters was objected to for the lack of affirmative pleadings.

6. There are views that the substitution of a party to a contract is a discharge of the original contract, *Williams v. Maryland Glass Corporation,* 134 Md. 320, 106 A. 755, 757–58 (1919), or, stated differently, is the consent for a separate contract which releases the replaced party from the original contract. *Contractors Manage. Corp. v. McDowell–Kelly,* 136 Ga.App. 116, 220 S.E.2d 473, 476 (1975). *But cf. Minder & Jorgenson Land Co. v. Brustuen,* 26 S.D. 38, 127 N.W. 546, 547 (1910) (holding that the substitution of a party acts as a modification discharging the replaced party and substituting the new party with the same rights and liabilities).

7. Parenthetically, it is noted that Johnson, in arguing there was no termination of the contract, cites authorities giving these two general rules for modification: (1) the party relying on a modification of a contract has the burden of proving not only the modification, but that it was made known to and accepted by the other party; and (2) whether a contract has been modified depends upon the intention of the parties, a question of fact for the jury to determine. Johnson does not argue the applicability of the rules to this cause other than to perhaps infer the jury passed on the question in finding Johnson and Greenbelt had a contract at the time the meter was removed. It suffices to state that the rules become applicable when, as illustrated in the authorities cited therefor, the issue of modification is contested, which is not, nor contended to be, the situation here. The parties neither dispute the tenor of their conversation nor assert some intent other than Johnson's intent that the contract be not terminated. The conversation, acts and conduct of the parties clearly establish the mutual intent to substitute Castleberry as a party to the contract in the place of Johnson. *See, e. g., Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 426 (1953).

approved). By law, once the contract was modified by the mutual consent of the original parties, it became a new agreement, taking the place of the old and consisting of the new terms and as much of the old as remained unchanged. *Id.* at 338. The new agreement rests in parol, *Id.* at 338, and thereafter determines the rights of the parties to it. 17A C.J.S. Contracts § 379 (1963); *Luglan v. Tomlin,* 287 S.W.2d 188, 189 (Tex.Civ.App.–San Antonio 1956, writ ref'd n. r. e.).

 These principles dictate that the modification and Castleberry's evidenced acceptance created between Greenbelt and Castleberry a new contract to which Johnson was not a party. The new agreement, embodying the terms of the 1972 contract, authorized the discontinuance of electric service when Castleberry did not pay for the service received. *Accord, Texas Power & Light Co. v. Taylor,* 201 S.W. 205, 206 (Tex.Civ.App.–Dallas 1918, no writ). *Taylor* is cited for the principle that an electric company has the right to discontinue service to a customer who fails to comply with the contract concerning the time and manner of paying for the electricity purchased by him. 21 Tex.Jur.2d Electric Companies § 11 (1961).

Consequently, at the time Johnson reentered the premises because of Castleberry's delinquency to him, Greenbelt's right to discontinue service under the agreement as it then existed with Castleberry had accrued. No efforts were made to alter that situation, or to seek a reinstatement of the 1972 contract between Johnson and Greenbelt, or to achieve a substitution of Johnson for Castleberry under the August, 1974 modified agreement. Thus, when the meter was removed, there was no contract by which Greenbelt owed a duty to furnish electric service to Johnson.

This conclusion validates Greenbelt's motion for judgment non obstante veredicto. One of the grounds stated therefor was that there is no evidence to support the jury's answer to special issue no. 1, *i. e.,* that at the time the meter was removed, Johnson and Greenbelt had a contract for Greenbelt to furnish electric service to the building. The erroneous overruling of the motion is the subject of Greenbelt's third point of error, which, from what has been written, must be sustained. The sustention pretermits a discussion of Greenbelt's other points of error.

The portion of the judgment decreeing that Bill Johnson recover on a contract is reversed, and judgment is here rendered that Bill Johnson take nothing by his action.