**Anne Windfohr SOWELL, Individually and W.A. Landreth, Edward R. Hudson, Jr., C.D. Williamson, and George Young, in their capacities as Trustees of the Mary Couts Burnett Trust**

v.

**NORTHWEST CENTRAL PIPELINE CORPORATION, a corporation.**

Civ. A. No. 4–82–459–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Feb. 18, 1988.

---

Dee J. Kelly, Robert C. Grable, Kelly, Appleman, Hart & Hallman, Fort Worth, Tex., for plaintiffs.

Michael Lowenberg, P.C., Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., William J. Sears, General Counsel, John H. Cary, Gen. Atty., Northwest Cent. Pipeline Corp., Tulsa, Okl., for Northwest Cent. Pipeline Corp.

James E. Coleman, Jr., Karen L. Hirschman, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Cities Service Gas Co.

## MEMORANDUM OPINION

MAHON, District Judge.

This case is the remaining portion of a suit by Plaintiff which originally included Conoco, Inc. and Cities Service Company, both of whom have settled with Plaintiffs. The only remaining defendant is Northwest Central Pipeline Corporation (Northwest).

Plaintiffs' First Cause of Action seeks declarations by this Court that Defendant Northwest is and remains a partial lessee of Plaintiffs under the 1927 Gas Lease and 1936 Empire Lease to the extent of the express liquid royalties provided in Paragraphs 7 and 9 of such Leases; and, declarations either that all "drips" [1] collected in Defendant's gathering system, from its field gathering lines through its Pampa Drip Control station are "drips" for which a full ⅛ royalty is due under Paragraph 9 of the Lease; or, alternatively, that such liquids are "natural gasoline" for which a royalty of ⅛ of either 20% or 25% of such liquids is payable under Paragraph 7 of the Lease. Plaintiffs' Second Cause of Action seeks damages for the uncontested nonpayment of such royalties. In their Third Cause of Action, Plaintiffs allege that Northwestern has breached a duty to take natural gas "ratably from Plaintiffs' lands in comparison with all purchases by [Northwest] from other wells in the Panhandle Field."

## FACTS

In 1927, a gas lease was executed to Empire Gas and Fuel from the Trustees of the Burnett Trust. In 1928, Empire Gas and Fuel assigned its interest under the gas lease to Cities Service Gas Pipeline. In 1935, Cities Service Gas Pipeline assigned the lease to Cities Service Gas Company (CSGC) (which is now Defendant Northwest).

In 1936, the Trustees of the Burnett Trust issued another lease, this time for *oil and* gas, to Empire Oil and Refining ("1936 Empire Lease"). Shortly thereafter, Empire Oil and Gas assigned its interests under the lease to CSGC. Thus, CSGC had the leasehold interests under both the 1927 Gas Lease and the 1936 Empire Lease.

Ever since gas began to flow out of the wells on the Burnett Ranch in the late 1920s, there has been a problem with trespassers entering the property in order to retrieve the "drips" which condense along the pipeline.[2] This caused great concern

1. The Court will refer to the gasoline in the pipelines as drips for the purpose of this opinion.

2. The drips are collected in drip pots which are located along the pipelines. It should be noted that the only reason that these drips were removed from the pipeline was to enhance the ability of the gas to flow through the line.

for the Burnett Ranch and the lessees because the trespassers would damage the pipeline in the process of retrieving the drips and sometimes caused fires at the drip cites. There was little or no concern by any of the parties about the actual removal of the drips. The main concern was the loss of gas and the damage to the property.

Because of the concern about the trespassers, the Burnett Ranch entered into an agreement with CSGC in August of 1937, (Defendant's Ex. 37). The agreement provided that CSGC would arrange for the drips to be removed from the drip pots along the pipelines in exchange for the Burnett Trust waiving its right to any royalties from the gasoline accumulated by such drips. Specifically, the Burnett Trust claimed "no interest, royalty or otherwise whatever, in the gasoline accumulated at such drips, and we do hereby waive expressly any right or claim of any nature or character whatever, that we may have, if any, to such gasoline." Pursuant to this agreement, CSGC contracted with W.L. Boyles to remove the drips. CSGC paid Mr. Boyles thirty dollars per month to provide this service.

In 1950, Empire Gas Company was organized under the laws of the State of Delaware. The company remained inactive until April of 1953. CSGC was the sole shareholder of the stock in Empire Gas Company.

An important year in this case is 1953. As stated above, CSGC had all of the interest under the 1927 Lease and the 1936 Empire Lease. However, on April 30, 1953, Empire Gas entered into a Gas Purchase Contract with CSGC under which Empire Gas leased the gas rights under the 1927 Lease and the 1936 Empire Lease to CSGC.[3] One is struck by the peculiarity of this transaction since Empire Gas was selling to CSGC an interest which CSGC already owned. Obviously for this Gas Purchase Agreement to have any meaning, CSGC must have assigned its interest in the leases to Empire Gas. CSGC made this assignment on May 21, 1953, and was effective as of March 31, 1953.

Putting aside the chronological sequence of events, what is the practical effect of these events. Effective March 31, 1953, CSGC assigned its oil *and* gas interests in the two leases to Cities Services Gas Producing Company. Effective the following day, April 1, 1953, CSGC purchased from Cities Producing the right to the gas interests under the lease. CSGC never reacquired any interest in the oil portion of the lease. In 1963, Conoco purchased the stock of Cities Producing. Later Cities Producing merged into Conoco. In 1982, Northwest Energy Company acquired CSGC and changed its name to Northwest Central Pipeline Corporation.

## I. Liquid Royalties

The Court finds that Plaintiff may not recover under its first two causes of action for the following three reasons.

### A. Contract Modification

■ The 1927 Lease allows the Burnett Trust to receive royalties for the drips under section 7 or 9. The 1937 agreement is a modification of the 1927 agreement since the Burnett Trust gave up its right to receive royalties on the drips. Such a modification is lawful if it is supported by consideration and if there is mutual consent. *Greenbelt Electric Coop., Inc. v. Johnson*, 608 S.W.2d 320, 324 (Tex.Civ.App.1980, no writ).

The modification is supported by consideration. Pursuant to the agreement between CSGC and the Burnett Trust, CSGC entered into a contract with an individual to remove the drips from the pipeline.[4] In

---

**3.** This agreement was made effective on April 1, 1953. Enron Gas also changed its name to Cities Producing.

**4.** If a modification is acted upon by one of the parties it is enforceable even if there is no consideration for the modification. *Craig, Thompson & Jeffries v. Barreda*, 200 S.W. 868,

869 (Tex.Civ.App.1917), rev'd on other grounds, 222 S.W. 177 (1920). In this case, it is clear that Cities Service Gas Company acted upon the modification when it employed an individual to remove the drips. Since CSGC acted upon the modification, it is enforceable.

addition, the documentation presented to the Court makes it clear that the Burnett Estate and CSGC both consented to the agreement whereby CSGC arranged for the removal of the drips in exchange for the Burnett Estate relinquishing its right to the royalties on the drip. (Defendant's Ex. 31–37). Therefore, the requirements for a lawful modification are met in this case.

Plaintiff argues that it did not waive its right to royalty payments under the 1927 Lease when it entered into the 1937 agreement with CSGC. Plaintiff argues that the drips had no monetary value and, consequently, that it could not obtain any royalties from the drips at that time. Plaintiff's argument continues that because the drips had no value and because Plaintiff could not receive any royalties from the drip, the Plaintiff's royalty interest was nonexistent. Plaintiff then states that one cannot waive a nonexistent right.

This Court cannot accept Plaintiff's contention that the drips have no value. The Court finds that the drips do have value. It is undisputed that the trespassers found value in the drips since they went to great lengths to obtain the drips.

Assuming that the drips did not have any monetary value the Court is still not persuaded by Plaintiff's argument. Plaintiff seems to argue that because the drips have no monetary value Plaintiff has no royalty interest in the drips. The Court disagrees. Simply because the drips do not have any value does not mean that Plaintiff does not have a royalty interest in the actual gasoline which composes the drips. The fact that the royalty interest is not rendering monetary benefits to the Plaintiff at the time that Plaintiff executed the waiver does not mean that the Plaintiff's royalty interest is nonexistent.

In sum, Plaintiff obtained a royalty interest in the drips in 1927 when it entered into the original lease. That interest continued to exist until 1937, at which time Plaintiff entered into the agreement with CSGC. This agreement provided that Plaintiff relinquished its royalty interest in exchange for CSGC arranging for the disposal of the drips. Thus, Plaintiff has waived any in-

terest in the drips because of the modification of the 1927 Lease by the 1937 Agreement. *Staples v. Railroad Commission of Texas*, 358 S.W.2d 706, 711 (Tex.Civ.App. 1962) (waiver is the relinquishment of a known and existing legal right).

**B. Northwest is not in Privity of Contract or Privity of Estate with Plaintiff**

■ The Court finds that its ruling on the liquid royalties issue can be decided on alternative grounds to those in the contract modification discussion above.

The Court finds that the documents surrounding the April and May 1953 transactions provide only one interpretation. The assignment, which was effective March 31, 1953, provides that CSGC assigned to Cities Producing "all Assignor's right, title, and interest in and under certain oil and gas leases [the 1927 Gas Lease and the 1936 Empire Lease]." Effective the following day, April 1, 1953, CSGC purchased from Cities Producing "gas rights under oil and gas leases [the 1927 and the 1936 leases]."

This interpretation is consistent with a letter agreement that CSGC entered into with Empire Gas Company on April 30, 1953. The agreement provides that "[s]imultaneously with the sale and purchase [by Cities Producing] of such rights inland and properties, ... Empire will enter into a contract with Cities [Service Gas Company] of all the gas produced from such rights in land and properties...."

Plaintiff contends that CSGC did not assign all of its interest in the leases to Cities Producing when it entered into the transaction in 1953. Even though the contract specifically provides that CSGC assigned all of its interest, Plaintiff requests the Court to find that such was not the case. Plaintiff asks the Court to find that CSGC assigned the gas to Cities Producing—but not the liquids contained within the gas.

There are only two ways in which Northwest may be liable to Sowell under the facts of this case. Northwest must be in privity of contract or privity of estate with Sowell. *Fay Corp. v. Bat Holdings I, Inc.*,

646 F.Supp. 946, 950 (W.D.Wash.1986). Northwest is not in privity of contract with Sowell since Northwest did not enter the original lease with the Burnett Trust. Empire Gas is the company that entered into the lease with the Burnett Trust.

Northwest is not in privity of estate either. In order to be in privity of estate, Northwest must have an interest in the lease during the pertinent time in question. *Pan Amer. Petroleum Corp. v. Gibbons,* 168 F.Supp. 867, 873 (D.Utah 1958), *aff'd.,* 262 F.2d 852 (10th Cir.1958); *Carter v. Stovall,* 291 S.W.2d 411, 413 (Tex.Civ.App. 1956); *Swiss Oil Corp. v. Fyffe,* 176 S.W.2d 398, 401 (Ky.1943) (assignee only responsible for obligations while he is in privity of estate). Plaintiff Sowell is seeking royalties on the lease for the years 1978 through 1985. The sequence of events outlined above illustrates that 1953 was the last year during which Northwest was in privi-

ty of estate. After April 1, 1953, all of Northwest's interest in the estate was transferred to Cities Producing.[5] Thus, it was the responsibility of Cities Producing to make the royalty payments. Cities Producing has been acquired by Conoco. The responsibility for the payment of the royalties was on Conoco and not Northwest.[6] As stated earlier, Conoco has settled with Plaintiff.

C. Course of Dealings

■ Alternatively, even if the 1953 Assignment was insufficient to discharge Northwest from its duties under the Leases, Plaintiffs have agreed to the substitution of Conoco for Northwest as Lessee. The evidence before the Court shows that Plaintiffs assented to the substitution of Conoco for Northwest as Lessee. After CSGC (Northwest) assigned its interests in the leases to Cities Producing in 1953, the

---

**5.** The 1953 transactions were made between corporations which were not dealing at arms lengths. *Cities Service Gas Producing Company v. Federal Power Commission,* 233 F.2d 726, 730 (10th Cir.1956). Cities Producing was created by CSGC to help make the 1953 transaction work as a means to obtain a greater rate hike from the Federal Power Commission. *See* text on ratable take issue.

CSGC and Cities Producing are subsidiaries of Cities Service Company. The question becomes which of these subsidiaries should pay the royalties to Plaintiff. The one subsidiary, CSGC, purchases the gas in its natural state from the other subsidiary, Cities Producing. Cities Producing is in privity of estate with the Burnett Trust. In such a situation, Cities Producing would be responsible for paying the royalties since it was in privity of estate with the lessor. It logically follows that the same burdens should be placed upon the successors of Cities Producing and CSGC. Thus, the burden for paying the royalties would be placed upon Conoco and not Northwest.

The equities favor Cities Producing's successor (Conoco) paying the royalties since Northwest paid Conoco the maximum price allowed under the Natural Gas Policy Act for the natural gas which it obtained from Conoco for the period from 1978 through 1985. This is the period for which Plaintiff seeks royalties in this case. The natural gas includes the liquids for which Plaintiff seeks royalties. Conoco has paid the royalties for the gas. The Court finds that Conoco should also be responsible for paying the royalties for the liquid contained within the gas.

**6.** Plaintiff vigorously argues that CSGC is a partial lessee as to the liquids within the natural

gas because it never lost the right to the liquids. As the partial lessee of the liquids, Plaintiff argues that CSGC should incur the cost of unpaid royalties. As is stated in the text, CSGC entered into this transaction with Cities Producing so that it could obtain additional money within the constraints of the Federal Power Commission. While it is recognized that CSGC's dealings with Cities Producing are not at arms length, there is no evidence that the 1953 transaction was a sham entered into to avoid paying royalties to Plaintiff. In fact, the drips on which Plaintiff is seeking royalties were worth very little in 1953.

The intracorporate transfer of 1953 transferred all of the leasehold interests from CSGC to a wholly owned subsidiary—Cities Producing. Along with the transfer of the leasehold interest was the transfer of the duty to pay royalties under the leases.

Plaintiff seems to argue that CSGC's successor, Northwest, should pay the back royalties because CSGC continued to obtain the liquids from the wells on which Plaintiff has the mineral interest. Although CSGC did continue to obtain the liquids from the wells, CSGC's legal position changed in relation to Plaintiff in 1953. CSGC no longer possessed the interests under the leases and, therefore, was no longer responsible for paying the royalties. (In addition, as stated in subpart A of this opinion, Burnett Trust waived its rights to royalties on the drips) Furthermore, as stated in footnote four, the Court finds that the equities do not justify an ignorance of the assignment from CSGC to Cities Producing.

leases were operated by Cities Producing until 1963, and then by Continental Gas Producing Company which was later merged into Conoco.

Thus, the leases were assigned in 1953 by CSGC to Cities Producing, and in 1963 to Conoco. The evidence shows that Plaintiffs were aware of the transfer to Cities Producing and of the transfer to Conoco after 1963, when Conoco had assumed its duties as lessee. Plaintiffs conducted substantial correspondence with Conoco concerning various terms of the leases, development of production and the market price of gas for purposes of determining the rate of royalties under the Leases. Plaintiffs at no time contacted Northwest concerning lease terms, operation of the leases, development of production or royalty payments. Rather, Plaintiffs have, at all time subsequent to 1962, looked solely to Conoco for compliance with the Leases and payment of royalties.

Since the Court has found that Northwest is not liable for payment of liquids royalty obligation under the 1927 Gas Lease, the Court need not consider the damages issues under Paragraphs 7 and 9 of the Lease with respect to gasoline content royalty or drip royalty.

## II. Ratable Takes

Plaintiff's third cause of action asserts that Northwest failed to take gas ratably from the wells on the Burnett Ranch. Plaintiff asserts that Northwest's duty to take the gas ratably from the wells on the ranch arises from both statutory and contractual provisions. The Court will address these arguments in turn.

### A. Statutory Duty to take Gas Ratably

■ The Court finds that Plaintiff cannot recover on its statutory claim because the Texas Common Purchaser Act does not

provide a private cause of action for Plaintiff.[7]

The Texas Common Purchaser Act, Tex.Nat Res.Code § 111.081 *et seq.*,[8] is made applicable to common purchasers of natural gas such as Northwest in § 111.083. The Act prohibits three types of discrimination by a purchaser of natural gas:

1. section 111.086 prevents discrimination "in favor of one producer ... against another producer ... in the same field."

2. section 111.086 also prevents discrimination "between fields in this state."

3. section 111.087 prevents discrimination by a common purchaser "in favor or its own production".

A private cause of action is only allowed for a violation of section 111.087 when a common purchaser discriminates against another in favor of its own production. *See* § 111.095; *Foree v. Crown Central Petroleum Corp.*, 431 S.W.2d 312 (Tex. 1968). No private cause of action exists for a violation of § 111.086. Rather, the statutes provide for administrative procedures before the Railroad Commission and/or a suit by the attorney general. *See* §§ 111.090–111.094.

Plaintiff alleges that Northwest violated § 111.086. As stated above, alleged violations of this provision must be directed to the Railroad Commission and not this Court. Plaintiff does not have a private cause of action for a violation of § 111.086.

In sum, Plaintiff's statutory claim fails because there is no private cause of action under the state provision.

### B. Contractual Duty to Take Gas Ratably

As this Court outlined in the facts, CSGC

---

7. Northwest invites the Court to consider the constitutionality of the Texas ratable take regulation. Although the Court finds great merit in Northwest's argument, it is not necessary to address the issue. Therefore, the Court declines to address the issue.

8. The regulation requiring purchasers to take ratably, 16 Tex.Admin.Code § 3.91(5) was promulgated by the Texas Railroad Commission pursuant to authority granted it by the Texas Common Purchaser Act. *See* § 111.083.

and Cities Producing [9] entered into a Gas Purchase Agreement in 1953. That agreement provided that CSGC, as the buyer, agreed to "receive gas in sufficient quantity to allow Seller's [Cities Producing] wells to produce ratably as herein defined." Ratably is defined in the contract to mean "in accordance with well allowables lawfully fixed and determined by the Texas Railroad Commission...." Thus, the agreement between CSGC and Cities Producing was that CSGC would purchase the maximum amount of gas allowed by law from the wells on which Cities Producing had the leases.

As the owner of the mineral interest on most of the wells on which Cities Producing had the leasehold interest, Plaintiff contends that it is a third party beneficiary to the contract between CSGC and Cities Producing. The 1927 Lease provides that the lessee, which in 1953 was Cities Producing, would "maintain reasonable production." Plaintiff contends that Cities Producing intended to benefit the mineral interest owner when it entered into the Gas Purchase Agreement. Plaintiff argues that Cities Producing intended to benefit the mineral interest owner of those wells because by getting CSGC to take the maximum amount allowed by law, Cities Producing was assuring that the mineral interest owners receive the maximum possible royalties. Plaintiff claims that Cities Producing entered into this provision of the contract to assist in satisfying its duty to the mineral interest owner.

■ The Court is not persuaded by Plaintiff's contentions. It has long been settled that it is the burden of the party claiming third party beneficiary status to prove its contention. *Nichols v. Acers Co.*, 415 S.W.2d 683, 691 (Tex.Civ.App.1967). In order to prove that one is a third party beneficiary the party must prove that the promisee under the contract intended to benefit the party when the promisee entered into the contract. *Corpus Christi Bank and Trust v. Smith*, 525 S.W.2d 501 (Tex.1975); *Hermann Hospital v. Liberty Life Assur. Co.*, 696 S.W.2d 37, 41 (Tex. App.1985). Thus, in this case, Burnett Trust must prove that Cities Producing intended to benefit Burnett Ranch when it entered into the Gas Purchase Agreement in 1953.

In order to decide this matter, a court should look primarily to the contract itself. *Republic Nat'l Bank v. National Bankers Life Ins. Co.*, 427 S.W.2d 76, 79 (Tex.Civ. App.1968). The Courts may also consider the circumstances surrounding the execution of the contract. *Guardian Financial Corp. of Beaumont v. Rollins*, 312 S.W.2d 553, 560–61 (Tex.Civ.App.1958).

■ It must be noted that courts distinguish between an intended beneficiary and an incidental beneficiary. Contracting parties may be aware that the contract into which they enter benefits a third party without intending for the contract to benefit the third party. In such a situation, the third party would be considered an incidental beneficiary. An incidental beneficiary may not enforce a provision of the contract. *Republic Nat'l Bank v. National Bankers Life Ins. Co.*, 427 S.W.2d at 79.

■ This Court finds that Burnett Trust has failed to meet its burden of proving that it was an intended beneficiary of the contract between CSGC and Cities Producing.[10] The evidence provided to the Court in the form of the written contract and the oral testimony does not illustrate an intent to benefit the Burnett Trust.

---

**9.** The actual parties to the contract were CSGC and Empire Gas Company. Empire Gas and Cities Producing are the same company.

**10.** The Court finds it interesting to note an apparent inconsistency in the arguments which Plaintiff has presented to the Court. With regard to the liquid royalties, Plaintiff argued that CSGC and Cities Producing entered into the 1953 transactions as a means of avoiding payment of royalties for gas under the 1927 and 1936 leases. *See e.g.,* Summary of Plaintiff's Claims in Pretrial Order. Plaintiff requested the Court to look through this alleged sham transaction which the parties entered into, according to Plaintiff, for their own benefit.

Now, in its argument to the Court on the ratable take issue, Plaintiff asserts that CSGC and Cities Producing entered into the 1953 Gas Producing Agreement with the intent to benefit Plaintiff.

The question for the Court to decide is whether CSGC and Cities Producing (which are basically the same entity) intended to benefit Burnett Trust when they arranged for CSGC to take the maximum amount of gas allowed by law out of the wells on which Cities Producing had the leasehold interest.

The wording of the contract does not support Plaintiff's contention. The contract requires CSGC to take a "sufficient quantity [of gas] to allow *Seller's* [Cities Producing's] wells to produce rabably...." (emphasis added).[11] At the time this contract was made, Cities Producing had the leasehold interest on wells which were located off of the Burnett Ranch. The contract requires Cities Producing to take rabably from *all* of the wells for which Cities Producing had the leasehold interest and not just those on the Burnett Ranch. This indicates that CSGC and Cities Producing were concerned about their interest in the wells and not the interest of royalty owners such as the Burnett Ranch. CSGC's promise to take rabably under the contract is *directed at* Cities Producing and not at the royalty owners on the wells which Cities Producing has leased.

The testimony presented to the Court also does not support Plaintiff's contention. Mr. Berney, who was a manager at CSGC in 1953, testified as to the reason that CSGC entered into the assignment and Gas Purchase Agreement in 1953. Mr. Berney explained that the transaction occurred as a result of the price regulation for gas by the Federal Power Commission.[12] In setting the rate that CSGC could charge, the Federal Power Commission would only allow CSGC to figure in the costs which CSGC incurred from the wells on which it was the lessee. Thus, CSGC could only include such things as royalties to the lessor, state severance tax and operating expenses.

In 1953 CSGC was preparing to request a rate increase from the Federal Power Commission. One of the reasons for requesting the increase was that CSGC was purchasing gas from other companies to sell to CSGC's customers. The cost of gas from the other companies was much higher than CSGC's cost to produce gas from its own wells. Thus one of the reasons that CSGC was requesting the increase was because of the higher cost for gas.

The employees of CSGC then came up with the idea that they could create a subsidiary corporation. Then they would transfer all of the operations of CSGC to the subsidiary. The subsidiary would make a contract with CSGC pursuant to which CSGC would buy back the natural gas at the going rate—meaning the rate at which CSGC was purchasing gas from other companies.

This idea of the CSGC employees became a reality. CSGC created Cities Producing. All of the leasehold interests were transferred to Cities Producing. Cities Producing then sold the gas rights back to CSGC under the Gas Purchase Agreement.

It is clear that the reason for entering into the 1953 transaction was simply to benefit CSGC.[13] There is no evidence before the Court that there was any intent to benefit the royalty owners through these transactions.

The parties to the contract in this case may have been aware that Burnett Trust was going to benefit from the agreement

---

11. The following sentence in the contract also provides that CSGC "agrees to purchase ... from *Seller* ... rabably...." (emphasis added).

12. The Federal Power Commission regulated gas which traveled in interstate commerce. Since CSGC was transporting gas in interstate commerce, it was subject to the regulation of the Federal Power Commission.

13. The transaction benefitted CSGC in the following manner. The Federal Power Commission would not allow CSGC to obtain a profit for the gas which was produced from the wells on which it had the leasehold interest. By transferring the leasehold interest to Cities Producing, CSGC would be required to buy the gas from Cities Producing. Therefore, CSGC would have to pay the price charged by Cities Producing. This price would be commensurate with the price charged by other companies in the industry and, therefore, would include a profit. Since CSGC and Cities Producing were part of the same larger corporation, the profit of Cities Producing also benefitted CSGC.

but this does not mean that they intended for Burnett Trust to benefit from the agreement. Whether these transactions benefitted Burnett Trust was not the concern of the parties when they entered into the 1953 transactions.

The Gas Purchase Agreement, the facts surrounding the making of the Agreement and the relationship of Burnett Ranch with CSGC and Cities Producing are such that the Court cannot infer that CGSC and/or Cities Producing intended to benefit Burnett Ranch when they entered into the ratable take provision of the 1953 Gas Purchase Agreement. Since Plaintiff is not a third party beneficiary, it cannot recover under its contractual claim.

In sum, the Court finds that Plaintiff cannot recover under its liquid royalty claims or its ratable take claim. A judgment will be entered consistent with this opinion.